[No. B158819. Second Dist., Div. Seven. Aug. 18, 2003.]

CHRIS BRAGG et al., Plaintiffs and Appellants, v.
JUDEN VALDEZ et al., Defendants and Respondents.

COUNSEL

Esner & Chang and Matthew H. Haberkorn for Plaintiffs and Appellants.

Schmid & Voiles and Suzanne De Rosa for Defendant and Respondent Vibuen Movsesian.

Cotkin, Collins & Ginsburg, William H. Ginsburg and Terry L. Kesinger for Defendant and Respondent Juden Valdez.

## OPINION

MUNOZ (AURELIO), J.*—Plaintiffs appeal from the order of dismissal entered following the sustaining without leave to amend of the demurrer to their second amended complaint filed by defendants. Appellants contend the trial court erroneously ruled that a physician's well-settled duty to exercise reasonable care to control the behavior of a patient who may endanger other persons is actionable only if that patient harms a readily identifiable plaintiff.

We hold that a treating psychiatrist who releases a patient simply because that patient has no insurance, when that patient has been involuntarily committed under the Lanterman-Petris-Short Act[1] (LPS Act) as a danger to himself and others, may be liable to the patient and any person that patient injures. We further hold the immunities for treating psychiatrists contained within the LPS Act are not applicable unless the treating psychiatrist complies with the requirements of the LPS Act prior to releasing someone who is a danger to himself or others.

### STATEMENT OF FACTS AND PROCEDURAL HISTORY

On February 21, 2002, plaintiffs, Chris, Mark and John Bragg (Braggs) filed a second amended complaint for damages against Juden Valdez, M.D. (Valdez), Viguen Movsesian, M.D. (Movsesian), Estate of Joshua Daniel Lee, deceased and Victoria Ainsworth, as successor in interest to Joshua Daniel Lee, deceased.

The Braggs alleged, in pertinent part, that they are the surviving heirs at law of decedent, Diane S. Bragg, their mother, and pursuant to Code of Civil Procedure section 377.60, were entitled to bring an action for her wrongful death.

Valdez and Movsesian are psychotherapists and served as attending physicians at Catholic Healthcare West, doing business as Robert Kennedy Medical Center. In that capacity, they undertook the care and treatment of Joshua Daniel Lee (Lee) and rendered professional services in the diagnosis, care and treatment of him. They evaluated Lee who, on January 7, 2001, was involuntarily admitted for a 72-hour detention, evaluation and treatment pursuant to Welfare and Institutions Code section 5150.[2] Lee's mother,

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution

[1] Welfare and Institutions Code section 5000 et seq.

[2] Welfare and Institutions Code section 5150 provides in pertinent part, "When any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer, member of the attending staff … may, upon probable cause, take or

Ainsworth, provided the hospital staff with sufficient information for detainment. Among other things, Ainsworth advised the hospital staff that Lee "was asking for a gun so [he] could end his life" and that his father was schizophrenic. The hospital staff also noted on its application for 72-hour detention, that Lee was "[v]erbally and physically abusive towards his mother and [emergency] staff." Based on this information and the fact that Lee told hospital staff that he smoked marijuana on a daily basis, the hospital determined that probable cause existed to believe that as a result of a mental disorder, Lee was a danger to himself and others. On the hospital's involuntary patient advisement prepared pursuant to Welfare and Institutions Code section 5157, subdivisions (c) and (d), the hospital stated that Lee was a danger to himself and others because "[he] struck [a] security guard and [was] threatening to hurt [himself]." He was then placed on emergency behavioral restraint with bilateral leather wrist and ankle restraints for combative/assaultive behavior indicating a serious risk or potential to cause bodily harm to himself or others, destructive behavior consisting of verbal or behavioral threats of destruction of significant property or the environment and verbal threats of violence with a strong likelihood for carrying out severely aggressive or destructive behavior.

The complaint additionally alleged that on several occasions from January 7 through 9, 2001, Lee communicated serious threats of physical violence against third parties, including anyone "who lays a hand on [him], female peers, female hospital staff, his mother and hospital security." It was alleged that plaintiff's mother was, to defendants, a third person reasonably identifiable as a potential victim of the threats in that she was a member of the general public.

On January 9, 2001, during the rendering of professional services in the diagnosis, care and treatment of Lee, Valdez and Movsesian determined Lee was still a danger to himself and others. They therefore certified him to receive intensive treatment related to a mental disorder for impairment for another 14 days in accordance with Welfare and Institutions Code section 5250.[3] Defendant doctors notified the Los Angeles Superior Court that Lee was placed on a 14-day hold to, apparently, schedule a probable cause

cause to be taken, the person into custody and place him or her in a facility designated by the county and approved by the State Department of Mental Health as a facility for 72-hour treatment and evaluation."

[3] Welfare and Institutions Code section 5250 provides in pertinent part, "If a person is detained for 72 hours under the provisions of Article 1 (commencing with Section 5150) ... and has received an evaluation, he or she may be certified for not more than 14 days of intensive treatment related to the mental disorder ... under the following conditions: (a) The professional staff of the agency or facility providing evaluation services has analyzed the person's condition and has found the person is, as a result of mental disorder or impairment by chronic alcoholism, a danger to others, or to himself or herself, or gravely disabled."

hearing at the hospital. The complaint further alleged that on that same day, Valdez gave Lee an injection of Haldol Decanoate, an antipsychotic medication, after determining that the patient was still a danger to himself and others. While under the care of defendants, Lee was prescribed antipsychotic medications, including Seroquel, Haldol Decanoate and lithium.

It was further alleged that defendants owed a duty to Lee to warn him of the effect of his not taking the medications prescribed for his mental disorder. Instead he was released to the general public with no follow-up care. Immediately following his release, Lee stopped taking his medications prescribed by the defendants. In breach of the duty described above, defendants negligently and carelessly failed to make any reasonable efforts to warn Lee or any member of his family, including his grandfather, to whose residence Lee was directed to have a taxi take him following his early release, that failure to continue taking the prescribed medications could and/or would have grave consequences.

It was further alleged defendants negligently and carelessly failed to make any reasonable efforts to communicate the threats to plaintiffs' decedent or to a law enforcement agency.

The complaint further alleged that on or about January 10, 2001, Lee, allegedly without medical insurance coverage, was discharged from the medical center. On January 29, as a direct and proximate result of the negligence and carelessness of defendants, Lee attacked, kidnapped and stabbed plaintiffs' decedent, a 66-year-old woman, with a knife, proximately causing her death. It was further alleged that defendants failed to exercise the proper degree of knowledge and skill and among other things failed to adequately and properly diagnose and treat Lee for mental disorders and negligently released Lee from involuntary hospitalization before the end of his detention pursuant to Welfare and Institutions Code section 5250.

Two days after the killing and three weeks after Lee had been discharged, defendant Valdez dictated a discharge summary for Lee that was factually different from the hospital records for the three days Lee had been confined.

Lee was arrested and booked on January 29, the day of the killing. A little over a week later, while being detained in jail, he was found dead, hanging from his bed sheet in his one-man cell.

Defendant Valdez demurred to the second amended complaint, asserting defendants did not have a physician-patient relationship with plaintiffs' decedent and therefore did not owe her a duty of care, and that any claim

based on defendant's alleged failure to warn was barred by *Tarasoff v. Regents of University of California.*[4] Defendant Movsesian filed a joinder to the demurrer.

Plaintiffs opposition asserted their theories of liability were based not on a duty to warn, but instead on the negligent failure of defendant Valdez to inform Joshua Daniel Lee of the effects of his prescribed medication and the failure to take it and the negligent failure of Valdez to retain or take control of Lee, recognizing that he posed a danger to the general public.

The trial court sustained the demurrer without leave to amend, concluding: "Plaintiffs plead insufficient facts to state a cause of action for negligence based on *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334]. Also, demurring defendants are immune from liability pursuant to Civil Code Section 43.92. Plaintiffs do not state facts to impose a duty on the part of defendants to warn of, predict, or protect from any alleged threats of physical violence by the patient."

## DISCUSSION

### A. *The Standard of Review*

"On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend, the standard of review is well settled. The reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded. [Citations.] The court does not, however, assume the truth of contentions, deductions or conclusions of law. [Citation.] The judgment must be affirmed 'if any one of the several grounds of demurrer is well taken. [Citations.]' [Citation.] ■ However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory. [Citation.] And it is an abuse of discretion to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment. [Citation.]" (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966–967 [9 Cal.Rptr.2d 92, 831 P.2d 317].)

---

[4] *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334].

Here, the complaint alleged two possible theories of liability against defendants; (1) a failure to advise Lee and his family of the grave consequences that could occur if Lee were to discontinue his medications[5] and (2) releasing Lee who was a danger to himself and others for a non-medical reason, lack of insurance, without taking steps to protect the public.[6] Because either legal theory would support a cause of action, the court erred in sustaining the demurrer without leave to amend. (*Aubrey v. Tri-City Hospital Dist., supra,* 2 Cal.4th 962.)

### B. *The Lanterman-Petris-Short Act[7] (LPS Act)*

"Under the LPS Act, a person who is dangerous or gravely disabled due to a mental disorder may be detained for involuntary treatment. However, in accordance with the legislative purpose of preventing inappropriate, indefinite commitments of mentally disordered persons, such detentions are implemented incrementally. [Citation.] Further these involuntary placements can be terminated before the expiration of the commitment period. Thus, the LPS Act assures a person properly detained of an opportunity for early release. [Citation.] [¶] However, the LPS Act also recognizes that the early release of involuntarily committed patients can pose a risk of harm to others. ▮ The evaluation and treatment of mentally disordered persons is inherently uncertain and cannot reliably predict future conduct. Nevertheless, the Legislature determined that the act's goal of ending indefinite confinements outweighed the early release potential for harm. Consequently, as a corollary to the early release provisions, the LPS Act exempts specified persons from civil or criminal liability. [Citation.]" (*Ford v. Norton* (2001) 89 Cal.App.4th 974, 979 [107 Cal.Rptr.2d 776]; see Welf. & Inst. Code, §§ 5154, 5278, 5259.3.)

The first step in the process is an initial 72-hour commitment pursuant to Welfare and Institutions Code section 5150.[8] "This section provides that when any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, specified persons may cause that mentally disordered individual to be placed in a designated facility for 72-hour treatment and evaluation. The persons who may take such action include peace officers, members of the staff of the evaluation facility,

---

[5] *Myers v. Quesenberry* (1983) 144 Cal.App.3d 888 [193 Cal.Rptr. 733]. Since Lee is deceased there might be proof problems as to this cause of action. Nonetheless it is a viable theory.

[6] Even though the complaint is not a model of clarity, on this theory, at oral argument counsel for appellants indicated this was also a theory being pursued.

[7] Lanterman-Petris-Short Act, Welfare and Institutions Code sections 5000 et seq.

[8] Unless otherwise indicated, all further section references shall be to the Welfare and Institutions Code.

designated members of a mobile crisis team, and other professional persons designated by the county. Thus, a broad range of personnel can initiate the placement of a mentally disordered individual for the 72-hour evaluation." (*Ford v. Norton, supra,* 89 Cal.App.4th at p. 979.)

If, after 72 hours, the person is still a danger to himself or others, he or she may be committed for an additional 14-day period for intensive treatment. (§ 5250.) Once that person is committed for an additional 14-day period he or she has the right to have a judicial determination of whether there is probable cause to detain the person for intensive treatment. (§ 5254.) The person being certified also has the right to counsel and the right to bring a writ of habeas corpus. (§§ 5254, 5254.1.)

In enacting the LPS Act, the Legislature determined the goal of ending indefinite confinements outweighed the early release potential for harm. The Legislature further recognized that the early release of involuntarily committed patients posed possible risks of harm to others. Also, realizing that evaluation and treatment of mentally disordered persons is inherently uncertain and cannot reliably predict future conduct, the Legislature exempted specified persons from civil or criminal liability.[9] (*Michael E. L. v. County of San Diego* (1986) 183 Cal.App.3d 515, 530 [228 Cal.Rptr. 139].)

### C. A Duty of Care is Owed to the Person Injured if an Involuntarily Committed Person is Released for Improper Reasons and Later Harms an Innocent Third Party

Before determining the immunity issue, the question of duty must first be determined. ■ "Conceptually, the question of the applicability of a statutory immunity does not even arise until it is determined that a defendant otherwise owes a duty of care to the plaintiff and thus would be liable in the absence of such immunity." (*Williams v. State of California* (1983) 34 Cal.3d 18, 22 [192 Cal.Rptr. 233, 664 P.2d 137].) However, "To say that someone owes another a duty of care ' "is a shorthand statement of a conclusion, rather than an aid to analysis in itself.... '[D]uty' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." [Citation.]' (*Dillon v. Legg* (1968) 68 Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912].)

---

[9] Compare *Thompson v. County of Alameda* (1980) 27 Cal.3d 741 [167 Cal.Rptr. 70, 614 P.2d 728] and *Martinez v. California* (1980) 444 U.S. 277 [62 L.Ed.2d 481, 100 S.Ct. 553] where the courts held the Legislature had granted immunity to certain public officials for actions committed by parolees with *Johnson v. State of California* (1969) 69 Cal.2d 782 [73 Cal.Rptr. 240, 447 P.2d 352] where the court held no immunity existed for parole agent who placed a "dangerous parolee" in a home without notifying the "foster parents" about the parolee's "homicidal tendencies."

'[L]egal duties are not discoverable facts of nature, but merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done.' (*Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 434 [131 Cal.Rptr. 14, 551 P.2d 334] (*Tarasoff*).)" (*Hoff v. Vacaville Unified School Dist.* (1988) 19 Cal.4th 925, 933 [80 Cal.Rptr.2d 811, 968 P.2d 522].)

■ In determining whether there is a duty owed to a particular individual there are numerous matters that need to be balanced: (1) the foreseeability of harm to the plaintiff, (2) the degree of certainty plaintiff suffered injury, (3) the closeness of the connection between the defendant's conduct and the injury suffered, (4) the moral blame attached to the defendant's conduct, (5) the policy of preventing future harm, (6) the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for the breach, and (8) the availability, cost, and prevalence of insurance for the risk involved. (*Rowland v. Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561]; *Paz v. State of California* (2000) 22 Cal.4th 550, 557 [93 Cal.Rptr.2d 703, 994 P.2d 975].)

Here, assuming the allegations are true, Lee, who had been restrained with "bilateral ankle and wrist restraints" after striking a security guard, was enough of a danger to others that defendants had requested an additional 14 days' commitment so that Lee could receive the intensive psychotherapy they felt was necessary. Nevertheless, without receiving any therapy, and without any notification to any other mental health care provider or the police, Lee was turned loose into an unsuspecting community. The ostensible reason: Lee had no insurance. ■ It is foreseeable that someone who is dangerous to others is liable to act out and be dangerous. That Lee did act out and kill plaintiff's mother is not disputed. It is alleged that Lee's killing of plaintiffs' mother was due to defendant's release of Lee because of monetary reasons, not because Lee was no longer a danger to others. Preventing future incidents is also furthered by imposing a duty to the injured party.[10] The insurance availability question is a nonissue in this case because all that is being

---

[10] We are not suggesting a hospital or a doctor has to continue indefinitely treating a person who is dangerous. One possible solution for a private hospital or doctor at a private hospital would be to notify the police before a person who is a danger to others is ejected from a mental health facility because he or she is uninsured. The burden upon defendants is not great: If they choose not to treat an individual whom they consider dangerous enough to involuntarily commit merely because he or she is uninsured then all they have to do is call the police so that the police can take that individual to a public facility that can and will treat that individual. Under section 5150 (see fn. 2, *ante*) a police officer may take a dangerous individual to a facility designated by the county and have a person who is dangerous to himself or others committed for an initial 72-hour commitment. Thus, even a phone call to a police agency would be enough to start the process at the public facility. (See *Whaley v. Jansen* (1962) 208 Cal.App.2d 222 [25 Cal.Rptr. 184] [officer may place a person in a mental health facility

required is that doctors make decisions on medical,[11] not monetary grounds. Finally, there can be no moral justification for ejecting upon society, without notice, a person who is dangerous to others merely because he is uninsured. Thus, based upon the factors set forth in *Rowland v. Christian, supra,* 69 Cal.2d 108 at p. 113, defendants owed a duty to anyone assaulted or injured by Lee. (See *Tarasoff v. Regents of University of California, supra,* 17 Cal.4th 425, 435 & fn.5.)

This rule is in accordance with *Tarasoff* and subsequent case law that holds, "When the avoidance of foreseeable harm to a third person requires a defendant to control the conduct of a person with whom the defendant has a special relationship (such as physician and patient) or to warn the person of the risks involved in certain conduct, the defendant's duty extends to a third person with whom the defendant does not have a special relationship." (*Reisner v. Regents of University of California* (1995) 31 Cal.App.4th 1195, 1198 [37 Cal.Rptr.2d 518].)

### D. *If the Facts Alleged Can be Proved Legislative Immunity Does Not Bar This Case*

The immunity for the initial 72-hour commitment is found in section 5154. That section provides that if the provisions of Section 5152[12] have been met the psychiatrist in charge of the committed persons treatment shall not be held liable civilly or criminally liable for any actions committed by a person who has been released prior to or at the end of the initial 72-hour commitment. This immunity is in keeping with the Legislative intent that there be an end to the "inappropriate, indefinite, and involuntary commitment of mentally

---

pursuant to section 5150 if the officer has reasonable cause to believe the person is a danger to himself or others].)

[11] As discussed in the next part, *post,* there is immunity if the decision even though in error, is made based upon medical grounds.

[12] Section 5152 provides, "(a) Each person admitted to a facility for 72-hour treatment and evaluation under the provisions of this article shall receive an evaluation as soon after he or she is admitted as possible and shall receive whatever treatment and care his or her condition requires for the full period that he or she is held. The person shall be released before 72 hours have elapsed only if, the psychiatrist directly responsible for the person's treatment believes, as a result of his or her personal observations, that the person no longer requires evaluation or treatment. If any other professional person who is authorized to release the person, believes the person should be released before 72 hours have elapsed, and the psychiatrist directly responsible for the person's treatment objects, the matter shall be referred to the medical director of the facility for the final decision. However, if the medical director is not a psychiatrist, he or she shall appoint a designee who is a psychiatrist. If the matter is referred, the person shall be released before 72 hours have elapsed only if the psychiatrist making the final decision believes, as a result of his or her personal observations, that the person no longer requires evaluation or treatment."

disordered persons ... and to eliminate disabilities. (Section 5001, subd. (a).) There is a similar provision for the section 5250 14-day commitment in section 5259.3.[13] In section 5278[14] the Legislature has also granted immunity for the decision to commit an individual.[15]

    What is common to sections 5154 and 5259.3 is a requirement that the decision must be made by the psychiatrist in charge of the person committed and then only as a result of personal observations. In relevant part section 5259.3 provides that the person committed may be released only if the psychiatrist in charge of the person "believes, as a result of his or her personal observations that the person certified no longer is, as a result of mental disorder ... a danger to others ...." The immunity provided for in sections 5154 and 5259.3 is personal to the treating psychiatrist and if another person, for example a psychologist, releases a person that psychologist can and is liable for any harm the released person causes. (See *Ford v. Norton, supra*, 89 Cal.App.4th 974.) Thus, the immunity applies as long as the psychiatrist, based upon his own personal observations, believes the person is no longer a danger. In other words, it assumes the psychiatrist is acting in good faith. Here, of course, the allegation is that defendants made their decision not on the fact he was no longer a danger, but instead on the fact he was not insured. If that allegation is proved at trial, then there would be no immunity under section 5259.3.

### E. The Trial Court Erred in Concluding the Action was Barred by *Tarasoff v Regents of the University of California*

In *Tarasoff v. The Regents of the University of California, supra*, 17 Cal.3d 425, our Supreme Court held, "When a therapist determines, or pursuant to the standards of his profession should determine, that his patient presents a

---

[13] Section 5259.3 provides, in relevant part "(a) Notwithstanding Section 5113, if the provisions of Section 5257 have been met, ... the psychiatrist directly responsible for the person's treatment shall not be held civilly or criminally liable for any action by a person released before the end of 14 days pursuant to this article. [¶] (b) The ... psychiatrist directly responsible for the person's treatment shall not be held civilly or criminally liable for any action by a person released at the end of the 14 days pursuant to this article."

[14] Section 5278 provides, "Individuals authorized under this part to detain a person for 72-hour treatment and evaluation pursuant to Article 1 (commencing with Section 5150) or Article 2 (commencing with Section 5200), or to certify a person for intensive treatment pursuant to Article 4 (commencing with Section 5250) or Article 4.5 (commencing with Section 5260) or Article 4.7 (commencing with Section 5270.10) or to file a petition for post-certification treatment for a person pursuant to Article 6 (commencing with Section 5300) shall not be held either criminally or civilly liable for exercising this authority in accordance with the law."

[15] See *Heater v. Southwood Psychiatric Center* (1996) 42 Cal.App.4th 1068 [49 Cal.Rptr.2d 880] where the plaintiff tried to bring suit against almost everyone who had been involved in his involuntary detention pursuant to sections 5150 and 5250. The court held immunity applied.

serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger. The discharge of this duty may require the therapist to take one or more of various steps, depending upon the nature of the case. Thus it may call for him to warn the intended victim or others likely to apprise the victim of the danger, to notify the police, or to take whatever other steps are reasonably necessary under the circumstances." (*Id.* at p. 431.)

Where the trial court erred is in analyzing this case as a *Tarasoff* case. However, this complaint does not allege a failure to warn a known victim. The complaint in this case alleged a negligent release based upon factors other than the professional judgment that is required when a psychiatrist treats an individual who is a danger to himself or to others. Thus, *Tarasoff* is inapplicable.

> F. *Civil Code Section 43.92 Does Not Provide Immunity Under These Facts*

In response to *Tarasoff* the Legislature enacted Civil Code section 43.92 which provides,[16] "(a) There shall be no monetary liability on the part of, and no cause of action shall arise against, any person who is a psychotherapist as defined in Section 1010 of the Evidence Code in failing to warn of and protect from a patient's threatened violent behavior or failing to predict and warn of and protect from a patient's violent behavior except where the patient has communicated to the psychotherapist a serious threat of physical violence against a reasonably identifiable victim or victims. [¶] (b) If there is a duty to warn and protect under the limited circumstances specified above, the duty shall be discharged by the psychotherapist making reasonable efforts to communicate the threat to the victim or victims and to a law enforcement agency."

■ A reading of Civil Code section 43.92 and the matters of which this court has taken judicial notice makes it clear that what the Legislature sought to protect was the privileged communications between a psychotherapist and his or her patient in a treatment setting. Section 43.92 states what it means and means what it says: There is no duty to warn unless the patient has made a specific threat against a specific identifiable person. What we have in this complaint is an alleged failure to do one's duty under the involuntary

---

[16] Defendant Valdez requested this court to take judicial notice of the analysis of the Senate Rules Committee Office of Senate Floor Analysis and a letter from the State Bar legislation representative to Assemblyman McAllister, the author of the bill, in order to aid us in our determination as to what the legislature intended when enacted section 43.92. We granted and have taken judicial notice of both documents.

commitment procedures of the LPS Act. Just as *Tarasoff* is inapplicable to this case, so is section 43.92. This case is not dealing with judgment calls, but a dereliction of judgment.

### G. *Legal Cause is a Question for the Trier of Fact, Not this Court*

As a final argument, defendant Movsesian argues there is an insufficient causal connection between defendants' conduct and Mrs. Bragg's death. He further argues public policy militates against liability in this case. As we have already indicated, public policy supports the imposition of a duty in this case. At trial the trier of fact will have to make the determination, based undoubtedly upon the opinion of experts, as to whether the defendant's actions were the cause of Mrs. Bragg's death. It is only then that the determination of cause and legal cause can be made. It is much too early in the case to determine causation questions.

### DISPOSITION

The order of dismissal is reversed and the case is remanded for proceedings not inconsistent with this decision.

Appellants are to recover their costs on appeal.

Johnson, Acting P. J., and Woods, J., concurred.

A petition for a rehearing was denied September 4, 2003.