[No. F045914. Fifth Dist. Nov. 10, 2005.]

STEPHEN P. COBURN et al., Plaintiffs and Appellants, v.
DWIGHT W. SIEVERT, Defendant and Respondent.

1484

COUNSEL

Wild, Carter & Tipton and Gary L. Huss for Plaintiffs and Appellants.

Baker, Manock & Jensen, George L. Strasser and Dirk B. Paloutzian for Defendant and Respondent.

Horvitz & Levy, Julie L. Woods and Kim L. Nguyen for California Medical Association, California Hospital Association, California Dental Association and California Psychiatric Association as Amici Curiae on behalf of Defendant and Respondent.

OPINION

**DAWSON, J.**—Defendant Dwight W. Sievert, M.D. (Sievert) is the psychiatrist who treated and released plaintiff Edward Coburn early from an involuntary 72-hour detention imposed under Welfare and Institutions Code[1] section 5150. The day after his early release, Edward Coburn had a violent outburst on an airplane with his father Stephen P. Coburn. Claiming negligent treatment and premature release, Edward Coburn and Stephen Coburn[2] sued Sievert for damages arising from the acts Coburn committed on the airplane.

Sievert was granted summary judgment on the ground that, under section 5154 subdivision (a), he is immune from liability because he was the treating psychiatrist who authorized early release based on his personal observations of Coburn. Plaintiffs appeal the grant of summary judgment, claiming that the trial court erroneously construed and applied provisions of the Lanterman-Petris-Short (LPS) Act (§ 5000 et seq.) governing early release and related immunity.

---

[1] All further statutory references are to the Welfare and Institutions Code, as in effect in 2001, unless otherwise indicated.

[2] For purposes of this opinion, we will use "plaintiffs" to refer to Stephen and Edward Coburn jointly, and "Coburn" to refer to Edward Coburn alone.

Section 5154, subdivision (a) provides that "if the provisions of Section 5152 have been met," the treating psychiatrist is not "liable for any action by a person released" early. We conclude: (1) the phrase "provisions of Section 5152" was intended to include only the conditions in section 5152 relating to early release; (2) this lawsuit only concerns liability for actions by Coburn; (3) a subjective standard for belief is imposed by the language in section 5152 that refers to the treating psychiatrist's belief "that the person no longer requires evaluation or treatment"; and (4) the evidence referenced by plaintiffs was insufficient to create a question of fact as to whether the psychiatrist subjectively believed that no further evaluation or treatment was needed. The judgment is affirmed.

## FACTS

*Undisputed Facts*

Because this appeal concerns a motion for summary judgment, this recitation begins with facts set forth in the separate statements filed by the parties. (See Code Civ. Proc., § 437c, subd. (b)(1) & (3); Cal. Rules of Court, rule 342(d) & (f).) The following four paragraphs contain facts that are undisputed.

First, Coburn was admitted to Cedar Vista Hospital (Cedar Vista) on October 5, 2001, in the context of an involuntary hold pursuant to section 5150. Sievert, a licensed and board-certified psychiatrist, was Coburn's treating physician during Coburn's stay at Cedar Vista. Sievert was directly responsible for Coburn's treatment while he was at Cedar Vista.

Second, Sievert personally observed Coburn on two separate occasions while Coburn was a patient at Cedar Vista; once on October 6, 2001, and again on October 7, 2001. Sievert discharged and released Coburn at 4:00 p.m. on October 7, 2001.

Third, on October 8, 2001, Coburn had a violent outburst during an airplane trip. At the time, he was traveling home from Fresno to Indiana with his father. The outburst resulted in criminal prosecution, civil lawsuits, property damage, and further confinement and treatment of Coburn.

Fourth, "[t]his action is one for damages alleged to have arisen out of [Coburn's] actions after having been released early from a 72-hour hold under . . . section 5150." (Fact No. 1, Sievert's separate statement.) Plaintiffs

"alleged that . . . Sievert negligently treated and prematurely released [Coburn]."[3] (Fact No. 4, Sievert's separate statement.)

*Disputed Facts*

First, with respect to facts in dispute, plaintiffs contested Sievert's assertion that "[b]ased upon his personal observations of [Coburn], . . . Sievert believed that [Coburn] no longer required evaluation or treatment and he therefore released [Coburn]." (Fact No. 9, Sievert's separate statement.) In particular, plaintiffs contended Sievert did not believe in good faith that further treatment and evaluation was not required. As supporting evidence, plaintiffs referred to nine documents contained in Coburn's medical file from Cedar Vista and a report from Victoria E. Lund.

Victoria E. Lund is licensed in Florida as a psychiatric and mental health advanced nurse practitioner and holds a Ph.D. in child and family services from Florida State University.[4] Her report to plaintiffs' counsel sets forth her assessment of the care and service Coburn was provided by Cedar Vista, which was based on her review of the documents in Coburn's medical file. She found "significant deviations from generally accepted standards of practice in the areas of assessment, diagnosis, treatment planning and discharge planning, implementation of interventions, and the evaluation of care and treatment provided to" Coburn while detained at Cedar Vista. Her findings are supported by her analysis of the information contained in, and missing from, the medical files.

For example, Lund stated that the nursing admission assessment form dated October 5, 2001, was incomplete because information about Coburn's sleep history was left blank and that other documents provided incomplete and inaccurate information regarding the use of sleep medication and

---

[3] During oral argument, plaintiffs characterized the lawsuit as involving damages with a nexus to both Sievert's negligent treatment and his premature release of Coburn, and invited the court to confirm this characterization by reviewing the allegations of the complaint. The complaint, however, was not among the documents designated for inclusion in the clerk's transcript and has not otherwise been made part of the appellate record. (See Cal. Rules of Court, rules 5 & 12.) Thus, our review is necessarily limited to facts stated and evidence referenced in the separate statements and the superior court's order which stated that the "parties have stipulated that the only theories being pursued are based on negligent diagnosis, treatment, staffing, medication, release, and failure to confine."

[4] Sievert objected to portions of Lund's report based on lack of foundation. The superior court's order granting summary judgment did not contain a ruling on these objections and, on appeal, Sievert has not claimed the superior court committed error in its handling of his evidentiary objections or otherwise challenged Lund's report on evidentiary grounds. (See generally *Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 139–140 [127 Cal.Rptr.2d 145] [discussing scenarios that arise for an appellate court when evidentiary objections are made below in connection with a motion for summary judgment].)

Coburn's medication compliance. According to Lund, these problems "compromise[d] the assessment process and g[ave] the false impression that [Coburn] was sleeping without problem at night and was compliant with taking medications, which he was not."

Also, sections regarding nutritional assessment and readiness for learning and educational needs were left completely blank.

Lund asserts the discharge diagnosis of Coburn as "Acute Manic Episode, in remission," was not clinically justified given the fact that Coburn was given three injections of an antipsychotic medication and two injections of a sedative hypnotic medication, which would have temporarily calmed his agitation but would by no means have justified a diagnosis of remission.

Second, referring to the same supporting evidence, plaintiffs also challenged Sievert's assertion that he "evaluated [Coburn's] condition and made appropriate orders concerning his care and treatment" (Fact No. 13, Sievert's separate statement) by contending that Sievert's orders were not appropriate.

Third, plaintiffs' separate statement listed additional disputed material facts. One dispute identified was whether Sievert met the standard of care in connection with evaluating, assessing, diagnosing, making discharge plans, implementing the interventions identified in the plan, and treating Coburn. More particularly, plaintiffs asserted that Sievert "failed to evaluate and assess [Coburn]'s condition in good faith before his release. Assessment data was omitted, inaccurate, and/or incomplete. The evaluation process was incomplete and inadequate." (Disputed Material Fact No. 4, plaintiffs' separate statement.) Among the supporting evidence referenced by plaintiffs was deposition testimony and hospital records that showed Sievert ordered a urine analysis at the time of Coburn's admission, the urine analysis was not done, and Sievert released Coburn without information from a test he thought sufficiently important to order.

Plaintiffs' separate statement also contained the conclusory assertion that the treatment and evaluation requirements of sections 5152 and 5154 were not met and, accordingly, Sievert was not entitled to immunity under those provisions.

## PROCEEDINGS

The superior court granted Sievert's motion for summary judgment on June 16, 2004. The court determined that the provisions of section 5152 were met and, therefore, Sievert was entitled to immunity under section 5154, subdivision (a). In determining the meaning of the statutes, the superior court

(1) concluded that the immunity for psychiatrists is not expressly conditioned on good faith or reasonableness and (2) refused to infer the Legislature intended such conditions to exist.

Judgment in favor of Sievert was filed on June 25, 2004, and plaintiffs filed a notice of appeal.

## DISCUSSION

### I. *Standard of Review*

■ Appellate courts conduct an independent review of questions of law; they decide them without deference to the decision made below. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 801 [35 Cal.Rptr.2d 418, 883 P.2d 960]; *Brasher's Cascade Auto Auction v. Valley Auto Sales & Leasing* (2004) 119 Cal.App.4th 1038, 1048 [15 Cal.Rptr.3d 70].) Issues of statutory construction as well as the application of that construction to a particular set of facts are questions of law. (E.g., *SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 461 [17 Cal.Rptr.3d 96]; *Twedt v. Franklin* (2003) 109 Cal.App.4th 413, 417 [134 Cal.Rptr.2d 740].)

■ In the context of a motion for summary judgment, questions of law include whether a triable issue of material fact exists and whether the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subds. (c) & (f); see *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972 [103 Cal.Rptr.2d 672, 16 P.3d 94].)

### II. *Background on the LPS Act*

■ The LPS Act governs the involuntary commitment of mentally disordered persons. Our Supreme Court has stated that the LPS Act "repealed the principal provisions for the civil commitment of mentally ill persons found in prior California law and replaced them by a new statutory scheme repealing the indeterminate commitment, removing the legal disabilities previously imposed upon persons adjudicated to be mentally ill, and enacting an extensive scheme of community-based services, emphasizing voluntary treatment and providing for periods of involuntary observation and crisis treatment for persons who are unable to care for themselves or whose condition makes them a danger to themselves or others. [Citations.]" (*Thorn v. Superior Court* (1970) 1 Cal.3d 666, 668 [83 Cal.Rptr. 600, 464 P.2d 56] [addressing provisions of LPS Act governing 14-day involuntary intensive treatment].)

■ The LPS Act made major changes regarding "(1) different time limits and procedures for involuntary commitment, (2) increased legal rights for

patients, and (3) provision for appointment of a conservator for 'gravely disabled persons.' [Citations.]" (3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 29, p. 84.) The time limits for involuntary commitment begin with detentions of 72 hours (§§ 5150, 5170), and include 14-day intensive treatment (§ 5250) and additional confinement for 180 days (§ 5300), which may be renewed (§ 5304, subd. (b)).

▮ Section 5150 authorizes a 72-hour detention of any person who is either a danger to himself or others or who is gravely disabled, in order to provide for treatment and evaluation. A broad range of personnel—including peace officers, members of the staff of the evaluation facility, designated members of a mobile crisis team, and other professional persons designated by the county—can initiate the placement of a mentally disordered person for the 72-hour evaluation. (*Ford v. Norton* (2001) 89 Cal.App.4th 974, 979 [107 Cal.Rptr.2d 776] [the word "psychiatrist" cannot be read to include psychologists].)

▮ Once admitted to a facility for a 72-hour detention, the detainee "shall receive an evaluation as soon after he or she is admitted as possible." (§ 5152, subd. (a); see § 5008, subd. (a) ["evaluation" defined].) In addition, the detainee "shall receive whatever treatment and care his or her condition requires for the full period that he or she is held." (§ 5152, subd. (a).) A person subject to 72-hour detention can be released early, released after the lapse of 72 hours, certified for an additional 14 days of intensive treatment, or placed under the control of an appointed conservator. (§§ 5152, subds. (a) & (b), 5250.) An early release from a 72-hour commitment may occur "only if . . . the psychiatrist directly responsible for the person's treatment believes, as a result of his or her personal observations, that the person no longer requires evaluation or treatment." (§§ 5152, subd. (a) [mentally disordered persons], 5172 [inebriated persons].)

▮ The LPS Act also contains a number of provisions that grant immunity to certain professionals from civil or criminal liability for any action by a person released early or at the end of a particular period of custody. (§§ 5154, subds. (a) & (b) [early and on-time release from 72-hour detention], 5173, subds. (a) & (b) [early and on-time release of inebriates from 72-hour detention], 5259.3, subds. (a) & (b) [early and on-time release from 14-day intensive treatment], 5267, subds. (a) & (b) [early and on-time release of suicidal person from 14-day intensive treatment], 5270.50 [early and on-time release from additional 30-day intensive treatment], 5306, subds. (a) & (b) [early and on-time release from involuntary treatment]; see § 5113.)

To guide the application of the various provisions of the LPS Act, including its immunity provisions, the Legislature explicitly stated:

"The provisions of [the LPS Act] shall be construed to promote the legislative intent as follows:

"(a) To end the inappropriate, indefinite, and involuntary commitment of mentally disordered persons, developmentally disabled persons, and persons impaired by chronic alcoholism, and to eliminate legal disabilities;

"(b) To provide prompt evaluation and treatment of persons with serious mental disorders or impaired by chronic alcoholism;

"(c) To guarantee and protect public safety;

"(d) To safeguard individual rights through judicial review;

"(e) To provide individualized treatment, supervision, and placement services by a conservatorship program for gravely disabled persons;

"(f) To encourage the full use of all existing agencies, professional personnel and public funds to accomplish these objectives and to prevent duplication of services and unnecessary expenditures;

"(g) To protect mentally disordered persons and developmentally disabled persons from criminal acts." (§ 5001.)

This court previously considered the relationship between the legislative intent set forth in section 5001, subdivision (a) and the immunity contained in section 5154 for early release from 72-hour detention. (See *Ford v. Norton, supra*, 89 Cal.App.4th at p. 980.) In *Ford*, we stated that the immunity advances the goal of ending inappropriate, indefinite, and involuntary commitments. (*Ibid.*)

### III. *Construction and Application of Language in LPS Act*

#### A. *Principles for Determining the Meaning of a Statute*

■ Generally, a reviewing court's "fundamental task in construing a statute is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute. [Citation.]" (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196]; see Code Civ. Proc., § 1859.) The analysis starts by examining the actual words of the statute, giving them their usual, ordinary meaning. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 476 [66 Cal.Rptr.2d 319, 940 P.2d 906].)

### 1. *Language ambiguous on its face*

 The initial examination of the words and grammar of the statute may lead to the conclusion that the statutory language is ambiguous on its face. Ambiguous means "susceptible to more than one reasonable interpretation." (*Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 519 [106 Cal.Rptr.2d 548, 22 P.3d 324].)

### 2. *Latent ambiguity*

 Alternatively, the initial examination may lead to the conclusion that " 'the language employed is clear and intelligible and suggests but a single meaning . . . .' " (*Mosk v. Superior Court* (1979) 25 Cal.3d 474, 495, fn. 18 [159 Cal.Rptr. 494, 601 P.2d 1030], superseded on other grounds in *Adams v. Commission on Judicial Performance* (1994) 8 Cal.4th 630, 650 [34 Cal.Rptr.2d 641, 882 P.2d 358].) Because legislative intent prevails over the words actually used (see *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299]), however, where a party argues a latent ambiguity exists, a court may not simply adopt a literal construction and end its inquiry. (See *County Sanitation Dist. No. 2 v. County of Kern* (2005) 127 Cal.App.4th 1544, 1620 [27 Cal.Rptr.3d 28] [literal construction checked against statutory purpose].)

 A latent ambiguity exists where " 'some extrinsic evidence creates a *necessity* for interpretation or a choice among two or more *possible meanings*.' [Citation.]" (*Mosk v. Superior Court, supra*, 25 Cal.3d at p. 495, fn. 18.) Such a necessity is present where a literal construction would frustrate rather than promote the purpose of the statute. (See *McCormick v. Board of Supervisors* (1988) 198 Cal.App.3d 352, 357–358 [243 Cal.Rptr. 617] [to promote statute's purpose, the word "request" was not given its ordinary meaning]; *Wear v. Calderon* (1981) 121 Cal.App.3d 818, 821 [175 Cal.Rptr. 566] [court read a good faith requirement into Code Civ. Proc., § 998 to accomplish legislative purpose].) Another example of such a necessity is presented where a literal construction would produce absurd consequences. (See *Provigo Corp. v. Alcoholic Beverage Control Appeals Bd.* (1994) 7 Cal.4th 561, 567 [28 Cal.Rptr.2d 638, 869 P.2d 1163] [Court of Appeal's plain meaning approach to constitutional provision rejected to avoid absurdity].)

 When a court reviews extrinsic material to determine whether a latent ambiguity exists, it must be careful not to rewrite an unambiguous statute by inserting qualifying language. (See Code Civ. Proc., § 1858; *Whaley v. Sony Computer Entertainment America, Inc.* (2004) 121 Cal.App.4th 479, 486 [17 Cal.Rptr.3d 88].) In other words, a court should not

create a latent ambiguity where none exists. Conversely, a court should not sacrifice legislative intent or purpose by overlooking a latent ambiguity and adopting a literal construction. (See *Select Base Materials, Inc. v. Board of Equalization* (1959) 51 Cal.2d 640, 645 [335 P.2d 672] [legislative purpose will not be sacrificed to a literal construction].)

### 3. *Meaning of unambiguous statute*

 If the statutory language is not ambiguous on its face and no latent ambiguity is identified, " ' "we presume the Legislature meant what it said and the plain meaning of the statute governs." ' " (*Pratt v. Vencor, Inc.* (2003) 105 Cal.App.4th 905, 909 [129 Cal.Rptr.2d 741].)

### 4. *Resolving meaning of ambiguous statute*

 Where ambiguity exists, "we look to 'extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' [Citation.]" (*Hoechst Celanese Corp. v. Franchise Tax Bd., supra,* 25 Cal.4th at p. 519; see generally 2A Singer, Sutherland Statutes and Statutory Construction (6th ed. 2000) §§ 47 [intrinsic aids] & 48 [extrinsic aids].)[5] The goal is to "select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." (*People v. Jenkins* (1995) 10 Cal.4th 234, 246 [40 Cal.Rptr.2d 903, 893 P.2d 1224].)

### B. *Plaintiffs' Construction and Application of LPS Act Immunity*

Plaintiffs raise two issues of statutory construction that involve language contained in subdivision (a) of section 5154, the pertinent part of which provided:[6]"(a) Notwithstanding Section 5113, *if the provisions of Section 5152 have been met,* . . . the psychiatrist directly responsible for the person's treatment shall not be held civilly or criminally liable *for any action by a person released* before the end of 72 hours pursuant to this article." (Italics added.)

---

[5] Thus, extrinsic aids can be used to (1) identify the existence of a latent ambiguity and (2) resolve the ambiguity. We recognized that the treatise cited has adopted a different view of what is an extrinsic aid than the California Supreme Court, though the difference in labels does not appear to create a difference in the use of those aids that would change the outcome in this case.

[6] Section 5154 was amended in 2003 to add language not pertinent here. (See Stats. 2003, ch. 94, § 2.)

First, plaintiffs argue that the phrase "if the provisions of Section 5152 have been met" was intended to refer to all of the sentences in section 5152 and not just those matters explicitly stated as conditions for early release.[7] Plaintiffs contend this result is compelled by the plain meaning of the words used in the statutory phrase as well as legislative purpose and underlying public policy.

Second, plaintiffs argue that the immunity from civil or criminal liability "for any action by a person released" early does not apply because this action concerns damages causally connected to the negligent treatment and evaluation of Coburn, which cannot be characterized as involving liability "for any action by" Coburn. Relying on *Gonzalez v. Paradise Valley Hospital* (2003) 111 Cal.App.4th 735 [3 Cal.Rptr.3d 903], plaintiffs contend that the immunity provisions of the LPS Act are "inapplicable to actions for negligence stemming from acts or omissions in evaluation or treatment during 72-hour holds."

In a third argument, plaintiffs contend that Sievert did not act in good faith in authorizing Coburn's early release. The term "good faith" is not used in either section 5152 or 5154 and, consequently, this argument must be tied to language set forth in section 5152 concerning the treating psychiatrist's belief regarding the need for further treatment or evaluation. (See part VI, *post.*) Specifically, a "person shall be released [early] only if, the psychiatrist directly responsible for the person's treatment *believes*, as a result of his or her personal observations, that *the person no longer requires evaluation or treatment.*" (§ 5152, subd. (a), italics added.)

We will address plaintiffs' three contentions, seriatim, in parts IV, V, and VI of this opinion.

---

[7] Section 5152 provided in pertinent part:

"(a) Each person admitted to a facility for 72-hour treatment and evaluation under the provisions of this article shall receive an evaluation as soon after he or she is admitted as possible and shall receive whatever treatment and care his or her condition requires for the full period that he or she is held. The person shall be released before 72 hours have elapsed only if, the psychiatrist directly responsible for the person's treatment *believes*, as a result of his or her personal observations, *that the person no longer requires evaluation or treatment.* . . .

"(b) Persons who have been detained for evaluation and treatment shall be released, referred for further care and treatment on a voluntary basis, or certified for intensive treatment, or a conservator or temporary conservator shall be appointed pursuant to this part as required." (Italics added.)

Subdivision (c) of section 5152 required that disclosures be made to the detainee about the probable effects and possible side effects of medication being given, and that records be kept about whether the disclosures were made and, if not made, the justification for not providing the information.

IV. *Prerequisites for Immunity*

 A. *Contrasting Views of Statutory Language*

 1. *Appellate briefs*

Plaintiffs argue that the reference in section 5154, subdivision (a) to "the provisions of Section 5152" was meant to include the requirement in section 5152 "that the patient receive the evaluation, . . . care, and treatment his condition requires while confined. . . . Thus, if the psychiatrist provides substandard evaluation, care, and treatment the requirements of Section 5152 have not been satisfied or met. In those cases, the immunity of Section 5154 is not extended to the psychiatrist as a reward for his incompetence." This approach is the same as reading the phrase "provisions of Section 5152" to mean "all that is provided for in Section 5152."

In his appellate brief, Sievert did not explicitly address the meaning of the actual words used in the phrase "if the provisions of Section 5152 have been met." For instance, his appellate brief did not undertake to define the word "provisions." Nevertheless, Sievert's position was clear enough—only the conditions set forth in the second sentence of subdivision (a) of section 5152 were relevant to the availability of the immunity, and he met those conditions. Thus, Sievert argued, in effect, that the other sentences in subdivision (a) of section 5152 as well as the entirety of subdivisions (b) and (c) were not "provisions of Section 5152."

 2. *Subsequent submissions*

Before oral argument in this matter, the California Medical Association, California Hospital Association, California Dental Association and California Psychiatric Association (amici curiae) applied to file a friend of the court brief in support of Sievert, and requested judicial notice of documents they selected from those assembled by Legislative Intent Service in conducting a review of the legislative history for sections 5152 and 5154. We directed the brief to be filed and granted the request for judicial notice.

Plaintiffs filed a response to amici curiae's brief and made objections to certain documents included in amici curiae's request for judicial notice. We have reviewed the documents to which plaintiffs objected. Most are letters from bill files maintained by different offices, and none directly address the Legislature's intent regarding the meaning of the statutory phrase "if the provisions of Section 5152 have been met." Thus, we sustain plaintiffs' objections to the extent they ask us not to rely on the documents when making our ruling.

Amici curiae took the position that the statutory phrase "if the provisions of Section 5152 have been met" contains a latent ambiguity, and they referred to various documents of legislative history to support an inference that the Legislature intended to provide immunity when the conditions relating to early release had been satisfied. Amici curiae also argued that construing the word "provisions" to mean all that is provided in section 5152 would lead to absurd consequences.

## B. *The Meaning of "Provisions"*

The key word in the phrase "if the provisions of Section 5152 have been met" is "provisions." The parties have cited and we have located no definition of the word "provisions," in either the Welfare and Institutions Code or published case law, for purposes of applying the LPS Act.

### 1. *Dictionary definitions*

To obtain the usual and ordinary meaning of a word, a court may refer to the definitions contained in a dictionary. (*Martinez v. Enterprise Rent-A-Car Co.* (2004) 119 Cal.App.4th 46, 54, fn. 3 [13 Cal.Rptr.3d 857].) Black's Law Dictionary defines "provision" to mean "**1.** A clause in a statute, contract, or other legal instrument. **2.** A stipulation made beforehand. See PROVISO." (Black's Law Dict. (7th ed. 1999) p. 1240.) Black's Law Dictionary defines "proviso" to include a "limitation, condition, or stipulation upon whose compliance a legal or formal document's validity or application may depend." (*Id.* at p. 1241.) Webster's Third New International Dictionary (1986) defines "provision" to include: "**4:** a stipulation (as a clause in a statute or contract) made in advance: PROVISO . . . **syn** see CONDITION." (*Id.* at p. 1827.)

From these definitions, the usual and ordinary meaning of the word "provisions" leads to the conclusion that all of the sentences in section 5152 are "provisions of section 5152." In other words, the word is " 'clear and intelligible and suggests but a single meaning . . . .' " (*Mosk v. Superior Court, supra,* 25 Cal.3d at p. 495, fn. 18.) Consequently, we must proceed to the step of determining whether a latent ambiguity exists by examining extrinsic aids such as legislative history, the ostensible objectives of the statute, and public policy.

### 2. *Legislative history*

The phrase "if the provisions of Section 5152 have been met" did not appear in the LPS Act until the passage of Assembly Bill No. 2201 (Reg. Sess. 1985–1986), which became effective September 30, 1985. (Stats. 1985,

ch. 1288, §§ 3, 13, pp. 4437–4438, 4442.) The amendments in this bill "transfer[ed] th[e] authority to authorize the release of a patient prior to the expiration of the commitment period, to the psychiatrist directly responsible for the person's treatment who is required to make the decision on the basis of his or her belief as a result of his or her personal observation." (Legis. Counsel's Dig., Assem. Bill No. 2201 (1985–1986 Reg. Sess.) 4 Stats. 1985, Summary Dig., p. 465.)

A statement of legislative intent appears in a staff analysis of Assembly Bill No. 2201 (1985–1986 Reg. Sess.) provided to the Senate Committee on Health and Human Services for an August 28, 1985, hearing: "[The bill c]larifies conditions for freedom from liability when release is before the end of the detention period, to the psychiatrist directly responsible for the person's treatment, *only if the psychiatrist making the final decision believes, as a result of his or her personal observations, that the person no longer requires evaluation or treatment*[.]" (Italics added.)

██ Although the phrase "if and only if" in place of "only if" would have been more explicit, we believe it is unlikely that a staff analysis would omit conditions upon which the availability of the immunity depends when it purports to state how the bill clarifies those conditions. A staff analysis is a useful indicator of legislative intent. (*Metropolitan Water Dist. v. Imperial Irrigation Dist.* (2000) 80 Cal.App.4th 1403, 1425 [96 Cal.Rptr.2d 314].) Certainly, this staff analysis is sufficient evidence of legislative intent at least to compel that we recognize a latent ambiguity in the phrase "if the provisions of Section 5152 have been met." As discussed below, we also will conclude that the staff analysis along with other indicators is persuasive evidence that the phrase "if the provisions of Section 5152 have been met" was intended to refer only to the conditions that must be satisfied before an early release is authorized.[8]

### 3. *Construction in context*

Plaintiffs' statutory construction limits the availability of the immunity from liability for the actions of someone released early from a 72-hour

---

[8] The legislative history of the 2003 amendments to the LPS Act, which extended certain authority and immunity to psychologists, supports the same construction for cases decided under the present version of the LPS Act. Legislative analyses of the Senate and the Assembly both stated that Assembly Bill No. 348 (2003–2004 Reg. Sess.) "[p]rohibits psychologists from being held civilly or criminally liable for any action by a person released before the end of a 72-hour, 14-day, or 30-day hold, *if the provisions of law relating to the early release of the person have been met*." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 348 (2003–2004 Reg. Sess.) as amended May 1, 2003, June 27, 2003, p. 2, italics added; Assem. Com. on Health, 3d reading analysis of Assem. Bill No. 348 (2003–2004 Reg. Sess.) May 1, 2003, p. 1, italics added.)

commitment by requiring the detainee receive (1) a prompt evaluation and (2) whatever treatment and care is required during the detention period. (See § 5152, subd. (a).) Under this construction, the scope of the immunity granted to a psychiatrist—who must decide whether to authorize an early release of someone detained for 72 hours—will differ significantly based on whether the decision is to continue the detention or to release early.

If the psychiatrist decides to continue detention and waits for the person to be released at the end of the 72 hours, the psychiatrist will be protected by the immunity set forth in section 5154, subdivision (b), which provides that "the psychiatrist directly responsible for the person's treatment shall not be held civilly or criminally liable for any action by a person released at the end of the 72 hours pursuant to this article." The immunity associated with release at the end of the holding period is not qualified by the phrase "if the provisions of Section 5152 have been met." Thus, under plaintiffs' statutory construction, psychiatrists would have a disincentive for granting early release because granting early release would mean accepting the risk associated with the uncertainty over whether the additional conditions were satisfied.

In addition, under plaintiffs' statutory construction, the psychiatrist's decision to grant early release would reduce the scope of the immunity provided to others when compared to the immunity that they would receive if the release occurred at the end of the 72-hour period. Those others would include "the professional person in charge of the facility" and "the medical director of the facility." (§ 5154, subd. (a).) This reduction in the scope of the immunity would create a further disincentive for early release.

A statutory construction that creates immunities of such different scope based on whether the release was early or at the end of the detention period is suspect because the balance of the competing interests struck in one situation is so different from the balance struck in the other situation, and *the difference itself* appears to undercut rather than further the purposes of the LPS Act.

To promote consistency between the availability of immunity provided for early release and the immunity provided for release at the end of a holding period, and bearing in mind that one of the stated purposes of the LPS Act is to "end the inappropriate, indefinite, and involuntary commitment of mentally disordered persons" (§ 5001, subd. (a)), we conclude the additional conditions imposed by the qualification "if the provisions of Section 5152 have been met" must be construed to mean only those conditions relating to early release.

Consequently, based on both legislative history and construction in context, we conclude that, of the two statutory constructions presented by the parties,

the construction implicit in Sievert's position produces greater harmony within the LPS Act, and we adopt that position.

### V. Basis for Liability—Negligent Treatment Versus Action by Coburn

Plaintiffs did not dispute the fact asserted by Sievert that "[t]his action is one for damages alleged to have arisen out of [Coburn's] actions after having been released early from a 72-hour hold under . . . section 5150." Nevertheless, they argue that this case does not concern civil liability "for any action by a person released" as that phrase is used in subdivision (a) of section 5154.

Plaintiffs rely on the opinions in *Gonzalez v. Paradise Valley Hospital*, *supra*, 111 Cal.App.4th 735, and *Jacobs v. Grossmont Hospital* (2003) 108 Cal.App.4th 69 [133 Cal.Rptr.2d 9]. Both cases, however, are distinguishable from the present case in that neither involved injuries to the detainee occurring after an authorized release from a 72-hour involuntary commitment. *Gonzalez* involved a patient who escaped from detention, broke into an occupied apartment nearby, cut his throat and abdomen with a kitchen knife, and was shot to death by police when he obeyed their order to come outside but disobeyed their order to drop the knife. (*Gonzalez v. Paradise Valley Hospital*, *supra*, at p. 738.) In *Jacobs*, the patient sued after she broke her leg in a fall that occurred while a nurse was assisting her down a corridor and a rubber slipper she was wearing caught on the floor. (*Jacobs v. Grossmont Hospital*, *supra*, at p. 72.)

The immunity statute considered in both *Gonzalez* and *Jacobs* was not section 5154 but, instead, section 5278, which does not contain the language with which we are now concerned—to wit, liability "for *any action by* a person released . . . ." (§ 5154, subd. (a), italics added.) Nothing we say in this opinion is intended to express disagreement with the holdings in either *Gonzalez* or *Jacobs*.

We agree with plaintiffs' position to the extent that we question whether the language of section 5154 was drafted with an eye toward liability for injuries that, while they may occur after an early release, are caused by negligent treatment during the detention rather than by actions of the person released. The following hypothetical situations are illustrative.

Assume a psychiatrist prescribes a medication that, after an early release, causes the patient to suffer a heart attack while driving, which in turn results in injury to the patient and to an innocent bystander. Does section 5154 immunize the psychiatrist from the results of the postrelease "action" of the patient? Amici curiae, who suggested this hypothetical, assert the immunity

would not apply. Or assume a psychiatrist sexually assaults a detained patient and later grants that patient an early release. If the assault later causes the patient to commit suicide—an "action by" the patient—is the psychiatrist immune? Are the injuries caused by the psychiatrist's conduct or, instead, by the actions of the patient made possible by his or her release?

While we suspect that application of section 5154 to support immunity in these hypothetical situations might give the legislation unintended scope (see *People v. Winters* (2001) 93 Cal.App.4th 273, 277 [113 Cal.Rptr.2d 158] [statutory language should not be given a literal meaning that results in absurd and unintended consequences]), we mention them here largely to limit the scope of this opinion to the facts that are presented. Plaintiffs suggest no facts that would support a conclusion that Sievert engaged in any conduct or treatment of Coburn that itself caused Coburn's subsequent actions. Rather, all of plaintiffs' facts show nothing more than a failure to diagnose, a failure to treat, and a release that was negligent because of those failures. We therefore need explore no further this subject, which of course includes complicated questions of legal causation. Plaintiffs appear to have correctly conceded, in listing the facts alleged by Sievert with which they did and did not agree, that this case involves liability for injuries arising out of the actions of Coburn.

## VI. *Treating Psychiatrist's Belief Regarding Further Treatment and Evaluation*

Plaintiffs argue that the provisions of section 5154 assume that the psychiatrist has acted in good faith and that a psychiatrist "cannot be found to have acted in 'good faith' if his conduct was negligent in the form of evaluation and treatment, and further fell beyond the prevailing standard of care[.]'" In their separate statement opposing summary judgment, plaintiffs asserted there were disputed material facts regarding whether Sievert evaluated and assessed Coburn's condition in good faith before authorizing Coburn's early release.

Plaintiffs rely on the opinion in *Bragg v. Valdez* (2003) 111 Cal.App.4th 421 [3 Cal.Rptr.3d 804] for the proposition that immunity is only available if the psychiatrist believed in good faith that the detainee no longer required evaluation or treatment. In that case, the court ruled that the statutory immunity of section 5154, subdivision (a) did not justify sustaining a demurrer where the complaint alleged that the patient was released because he was not insured. (*Bragg, supra,* at p. 433.) The court stated: "[T]he immunity applies as long as the psychiatrist, based upon his own personal observations, believes the person is no longer a danger. In other words, it assumes the psychiatrist is acting in good faith." (*Ibid.*)

From this statement, it appears that the court derived the good faith requirement from the statutory reference to what the treating psychiatrist believes. The specific statutory language stated that the "person shall be released [early] only if, the psychiatrist directly responsible for the person's treatment *believes*, as a result of his or her personal observations, that the person no longer requires evaluation or treatment." (§ 5152, subd. (a), italics added.) Consequently, to emphasize that the question before us is one of statutory construction rather than fleshing out a good faith requirement engrafted on the statute by judicial fiat, our discussion of plaintiffs' argument about Sievert's good faith will be phrased in terms of what Sievert believed.

### A. The Word "Believes" Implies a Subjective Standard

The first issue we address is whether the psychiatrist's belief should be judged under an objective or a subjective standard. In effect, we are asked to determine whether the Legislature meant that the psychiatrist's belief about the need for further evaluation or treatment should be reasonable (objective standard) or merely honest in fact (subjective standard). (Cf. Cal. U. Com. Code, § 1201, subd. (19) [subjective good faith standard means "honesty in fact in the conduct or transaction concerned"].)

 Similar to our Supreme Court's recognition that " 'good faith' is commonly thought of as subjective in essence" (*Cotran v. Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93, 106, fn. 3 [69 Cal.Rptr.2d 900, 948 P.2d 412], but see, e.g., *Akers v. Allaire* (1992) 17 Kan.App.2d 556, 558 [840 P.2d 547] [the phrase "belief of ownership" used in Kan. Stat. Ann. § 60-503 construed to mean a good faith, reasonable belief]), we conclude that the terms "belief" or "believes" are commonly understood as implying honesty in fact rather than reasonableness. In other words, a belief is not really a belief unless its holder in fact accepts the matter as true. Therefore, in stating that a belief must be honest in fact, we are not engrafting a modifier into the statute, but are simply recognizing what is inherent in the term itself. The same cannot be said of requiring the belief to be objectively reasonable.

Checking this statutory construction against extrinsic aids does not change our conclusion regarding the Legislature's intent in using the word "believes." Coburn has referenced and we are aware of no extrinsic evidence that demonstrates the Legislature intended to impose an objective standard of reasonableness when it used the word "believes" in section 5152, subdivision (a). In short, we will not infer the Legislature meant "reasonably believes" when it used the word "believes."

### B. A Triable Issue of Material Fact Does Not Exist

The question arises whether plaintiffs have referenced sufficient evidence in their papers opposing the summary judgment motion to create a triable

issue of fact regarding Sievert's subjective belief about Coburn's need for further evaluation or treatment at the time Sievert released him. Plaintiffs do not explicitly address a subjective belief requirement; they simply cite an undefined good faith requirement they derive from the opinion in *Bragg v. Valdez, supra,* 111 Cal.App.4th 421, and rely on their evidence showing a violation of professional standards of care to show the absence of this undefined good faith. Translated to the terms and requirement we have concluded must apply—that is, subjective belief—their argument appears to be that evidence of negligent evaluation and treatment is sufficient to raise a triable issue of fact regarding Sievert's subjective belief that no further evaluation or treatment was required.

We reject this line of reasoning. If evidence that a question of fact exists regarding compliance with professional standards in evaluation, treatment, or release were deemed sufficient to create a triable issue of fact under the subjective belief standard, then summary judgment on the immunity issue would become virtually unavailable. The efficacy of the immunity granted by the Legislature in section 5154, subdivision (a), and the purposes that immunity is designed to further, would be undermined.

The *Bragg* case involved a clearly presented alternative motive for the early release—economic concerns based on the detainee's lack of insurance. In this case, the evidence referenced in the separate statements does not suggest that Sievert had an inappropriate reason for granting early release or, indeed, any reason other than a perhaps negligent but nonetheless honest belief that Coburn no longer needed evaluation or treatment. Without more, we conclude, plaintiffs have not presented sufficient facts to show the existence of a triable issue of fact regarding Sievert's subjective belief.

## VII. *Summary*

The statutory phrase "if the provisions of Section 5152 have been met" means "if the conditions in section 5152 relating to the early release of a person have been met." We conclude that the facts presented here show, without contradiction, potential liability arising from "action by a person released" within the meaning of section 5154, subdivision (a). We leave for another day the question whether the immunity of section 5154 also extends to liability for injuries that result from actions caused by negligent treatment provided during the period of detention. Because Sievert's motion for summary judgment established that he met the conditions set forth in the second sentence of subdivision (a) of section 5152, including the subjective belief requirement, and plaintiffs failed to demonstrate the presence of a triable factual dispute regarding those conditions, Sievert was entitled to the entry of judgment in his favor.

## DISPOSITION

The judgment in favor of defendant Sievert is affirmed. Defendant Sievert shall recover his costs on appeal.

Vartabedian, Acting P. J., and Harris, J., concurred.