[No. G040605. Fourth Dist., Div. Three. Apr. 9, 2009.]

LAURENCE GREENBERG, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
DENISE SMITH et al., Real Parties in Interest.

1340

COUNSEL

Bonne, Bridges, Mueller, O'Keefe & Nichols and Joel Bruce Douglas for Petitioner.

No appearance for Respondent.

Law Offices of Barry Novack, Barry B. Novack and Jonathan Parrott for Real Parties in Interest.

OPINION

**IKOLA, J.**—In this tragic case, real parties in interest Denise Smith and her son, Brandon Smith (plaintiffs), sued petitioner Laurence Greenberg, a psychiatrist, for wrongful death due to medical negligence after petitioner's patient shot and killed two members of plaintiffs' immediate family.[1] Brandon also sued petitioner for emotional distress. Petitioner moved for summary judgment, but the trial court denied his motion. Petitioner now seeks a writ of mandate directing the trial court to grant him summary judgment. For the reasons discussed below, we grant the petition and issue the requested writ.

## FACTS

William Freund, a neighbor of the Smith family, suffered from Asperger's syndrome, a disorder described by plaintiffs as "a form of autism, which negatively affects an individual's social skills," and by petitioner as a condition "characterized by impairment and oddity of social interaction and restricted interest and behavior reminiscent of those seen in autistic disorder[, but without] significant delays . . . in language, cognitive development, or age-appropriate skills."

In June 2001, when Freund was 15 years old, a pediatric neurologist reported Freund was being teased by "bullies at school" and taking out his rage and frustration on his parents by throwing things at them and physically attacking them.[2]

---

[1] For convenience we refer to Denise Smith and Brandon Smith individually by their first names. We mean no disrespect.

[2] In her report dated *June* 14, 2001, the neurologist states she examined Freund on *October* 14, 2001, and incorrectly recites his age as 13 years old instead of 15.

Brandon was Freund's only known friend. To Brandon, Freund "never seemed like the violent type."

Petitioner initially treated Freund for three months in 2002, but Freund "and his family decided to return to their primary physician for psychiatric management." In April 2004, when Freund was almost 18 years old, he returned to petitioner's care. Thereafter, petitioner continuously treated Freund and prescribed him various medications.

In April 2005, Freund turned 19 years old. He was a high school graduate, attended ITT Tech college, had a computer-related job, and lived with his parents. On September 2, 2005, he joined an online Asperger's and autism community at a Web site called Wrong Planet.

On September 19, 2005, petitioner prescribed Geodon for Freund because of his "continued difficulties with irritability and moodiness, related to his depressive disorder[,] propensity to anxiety ('paranoid anxiety') and obsessive thinking regarding his inability to form close social relationships."

On October 3 and 4, 2005, Freund posted messages at WrongPlanet.net suggesting he wanted to kill himself and had unsuccessfully tried suicide. He stated he had no friends and was too anxious to talk to people, and his father was "onvercontroling [sic]" and "abusive." There is no evidence petitioner or Freund's parents knew of these postings.

On October 12, 2005, petitioner told Freund "to stop the Geodon" because the patient "still reported insomnia . . . and complained of dizziness since taking Geodon; [and his] parents related 'in and out of reality,' irritability and nastiness." That same day, petitioner prescribed a regimen of four medications for Freund: Lexapro, Effexor, Ativan, and Concerta. This was the first time petitioner prescribed Lexapro for Freund. Petitioner had been prescribing him Effexor for a year and a half at that time, Concerta for six months, and Ativan for three months. Freund had a history of not complying with prescribed medication regimens.

On October 15, 2005, Freund applied to buy a shotgun.

Between October 15 and 17, 2005, Freund posted messages at WrongPlanet.net saying he had bought a gun and needed to admit himself to a hospital for counseling and "social skill training." He stated he did not suffer from depression until he started taking psychoactive drugs because his parents thought he needed such medications. He stated he was going to cause

a lot of damage with his gun and hoped to hunt and "blast things away." He wrote: "My condition. Well [it's] gone from happy and hyper active to not even [being] able to keep my fingers from shaking on the keyboard, And it might have been pushed on what [I've] been doing to my body, but most likely because [I've] been forced to take a concoction [of] pills because my parents [at] the doctor['s] office [will] always deny They do something wrong, [as I try] to point out [they're] the problem. They lie to my face about things they said or [did]. . . . [T]hey just can['t] control [their] emotions, [and] when it comes up for my healing, they deny it and [I'm] labeled as a [trouble] maker [and] a bad, illogical person because [a]lmost all the time [I can't] convince the doctor because [my] parents start confusing me in order to get out [of] the doctor['s] crosshairs." He continued: "My health is [deteriorating] from [a reaction] with this drug called Geodone [*sic*], [I'm] not getting any better and nobody can figure out what it is. So I basically [got] screwed from the [psychiatrist] today. [¶] Now my parents [if] they had a brain would switch doctors but They unfortunat[e]ly like the doctors and don['t] care how I feel." Again, there is no evidence petitioner or Freund's parents knew of these postings.

On or around October 22, 2005, Brandon was driving home, saw Freund and his parents outside their house, and "stopped to see how they were doing." Brandon noticed Freund "wasn't himself." Freund "was very quiet, didn't say anything. All he pretty much said was, hey, what's up? And then he was quick to get into the house." Freund's "parents spoke briefly, saying that he was acting a little weird," but Freund's mother "was quick to change the subject."

On October 25, 2005, Freund took delivery of the shotgun.

On the morning of October 29, 2005, Freund went to the Smiths' house and shot and killed Brandon's father (Denise's husband) and Brandon's sister (Denise's daughter). Freund returned home and shot and killed himself. Brandon discovered the bodies of his father and sister after he was awoken by the sounds of gunshots and his sister screaming his name.

Prior to the shootings, plaintiffs and petitioner were unaware of any threats made by Freund to harm others or himself.

An autopsy showed the presence of the drugs, venlafaxine (Effexor) and citalopram (Celexa), in Freund's blood. According to petitioner, he never prescribed Celexa for Freund.

In November 2006, plaintiffs filed a complaint for wrongful death and emotional distress against Freund's estate, his parents, Doe health care providers, Doe pharmacists, the gun vendors, and the WrongPlanet.net operator.

In January 2007, plaintiffs amended their complaint to substitute petitioner for a Doe health care provider. They alleged petitioner, inter alia, prescribed Freund medications, including ziprasidone (Geodon), venlafaxine (Effexor) and citalopram (Celexa);[3] failed to warn Freund or his parents of the drugs' dangers; and proximately caused Freund to shoot and kill the victims. Petitioner demurred to the complaint. The court sustained petitioner's demurrer with leave to amend, finding "that immunity under Section 43.72 [*sic*] of the Civil Code applied, and that the demurring defendant owed no duty to the plaintiffs as alleged." Civil Code section 43.92 (section 43.92) immunizes psychotherapists from liability for failing to predict, warn of, or protect from a patient's violent behavior, unless the patient communicated to the psychotherapist a threat against an identifiable victim.[4]

The court allowed plaintiffs to amend their complaint "to the extent a cause of action can be pled on a claim that [petitioner] prescribed medications which caused [Freund] to commit violent acts upon plaintiffs' decedents . . . ."

Plaintiffs filed a first amended complaint for medical negligence alleging petitioner prescribed Freund medications, including Geodon, Effexor and Celexa, known "to have adverse side effects in teenagers, including homicidal and/or suicidal propensities," and that this negligent prescription of medication "increased the risk that . . . Freund would exhibit violent behavior, and . . . proximately cause him to shoot and kill" the victims. The first amended complaint also alleged Brandon suffered emotional distress from witnessing his dying relatives and being "within the zone of danger." Petitioner demurred to the first amended complaint. The court overruled his demurrer.

Petitioner moved for summary judgment, arguing, inter alia, he owed "no duty of care to third party strangers to the psychotherapist-patient relationship."[5] He supported his motion with his own declaration and that of Dr. Lester Zackler. Petitioner declared, inter alia, he was never aware Freund "had a violent history, had caused serious physical harm or death to anyone, or had an intention . . . to cause serious injury or death [to] any third

---

[3] Hereafter, we refer to these medications solely by their brand names.

[4] Subdivision (a) of section 43.92 provides: "There shall be no monetary liability on the part of, and no cause of action shall arise against, any person who is a psychotherapist as defined in Section 1010 of the Evidence Code in failing to warn of and protect from a patient's threatened violent behavior or failing to predict and warn of and protect from a patient's violent behavior except where the patient has communicated to the psychotherapist a serious threat of physical violence against a reasonably identifiable victim or victims."

[5] Petitioner also argued here and below that the statute of limitations barred plaintiffs' lawsuit. We need not address his contention since the duty issue is dispositive.

party . . . ." Dr. Zackler declared, inter alia, that Effexor and Celexa, "to a medical certainty, would be more likely to minimize if not prevent any violent or homicidal . . . tendencies or acts in someone like William Freund than create or increase the risk of such thoughts or behavior," and that the "administration of such ethical drugs [was] within the standard of care of reputable psychiatrists . . . ." He further declared that Geodon, Effexor and Celexa were "regularly used by reputable psychiatrists . . . to treat, variously, psychotic like symptoms, agitation, aggressiveness, impulsivity, hyperactivity, anxiety, depression, obsessive-compulsive symptomatology, etc." Attached to both petitioner's and Dr. Zackler's declarations were excerpts from the Physicians Desk Reference 2005 and 2006 editions describing Geodon, Effexor and Celexa, allegedly showing "none of these medications are understood or represented as being causally related to violence perpetrated on others or homicidal behavior by patients [taking] these drugs," and that "a black box warning alerting for the . . . risk of *suicidal* thought and behavior in children and adolescents" did not appear until 2006, sometime after the incident. (Italics added.)

In response, plaintiffs submitted evidence opposing petitioner's summary judgment motion, including a declaration of Dr. Mohan Nair. Dr. Nair declared, inter alia, that Effexor and Celexa "were at the time of the incident, labeled with black box warnings . . . of the potential for violent side effects in young people"; that Lexapro is a derivative of Celexa; that the Food and Drug Administration "and the American Academy of Child and Adolescent Psychiatry recommends weekly visits in the first four weeks that a patient is taking either of [these] medications"; and that combining "Effexor and Lexapro is unusual since it would increase the risk of serotonin syndrome, agitation, irritability, self injurious behavior and violence."

The court denied petitioner's summary judgment motion. The court ruled petitioner might owe a duty to plaintiffs even though "they were strangers to the doctor/patient relationship," and petitioner was not immune from the lawsuit under section 43.92. The court found the existence of triable factual issues based on the conflicting declarations of the parties' experts on whether petitioner violated the applicable standard of care.

Petitioner sought a writ of mandate from this court directing the trial court to grant his summary judgment motion, and requested a temporary stay of trial. We stayed trial of this matter and ordered plaintiffs to show cause why a writ of mandate should not issue.

## DISCUSSION

Plaintiffs contend their evidence opposing petitioner's summary judgment motion showed "that there are triable issues of material fact in this case and that summary judgment would not be appropriate." They assert petitioner (1) "knew or should have known that the medications he prescribed for [Freund] could cause violent adverse side effects"; (2) failed to properly monitor Freund during the two weeks between petitioner's prescribing him Lexapro and the murders; (3) "had a duty to treat . . . Freund so as not to cause him to harm others"; and (4) "breached his duty to plaintiffs' decedents by failing to treat [Freund] appropriately, proximately causing the death of plaintiffs' decedents." Their action is "for negligence on the part of [petitioner] in breaching his duty of care so as not to create a risk of harm to third persons." Plaintiffs assert they "have *not* based their liability [claim on section 43.92], so that code section is irrelevant." In plaintiffs' view, section 43.92 "only applies to situations where an *otherwise* dangerous patient expresses a definite threat to a psychotherapist," and not "when the psychotherapist has *caused* the patient to become dangerous by treating the patient negligently."

A "motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) "A defendant moving for summary judgment 'bears the burden of persuasion that "one or more elements of" the "cause of action" in question "cannot be established," or that "there is a complete defense" thereto.' " (*Calderon v. Glick* (2005) 131 Cal.App.4th 224, 230 [31 Cal.Rptr.3d 707] (*Calderon*).) An appellate court reviews "the trial court's decision de novo, considering all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports." (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 [110 Cal.Rptr.2d 370, 28 P.3d 116].) The moving party's evidence is strictly construed, while that of the opponent is liberally construed, and "any doubts as to the propriety of granting the motion" are resolved in the opponent's favor. (*Robert T. Miner, M.D., Inc. v. Tustin Ave. Investors* (2004) 116 Cal.App.4th 264, 270 [10 Cal.Rptr.3d 178].)

Petitioner contends he should be granted summary judgment because a "psychiatrist acting in good faith owes no duty of care to third parties foreign to the psychotherapeutic relationship," relying on *Calderon, supra,* 131 Cal.App.4th 224. In *Calderon*, a psychotherapeutic patient falsely believed his former girlfriend transmitted a blood virus to him and that it would kill him. (*Id.* at p. 228.) The defendant psychotherapists evaluated and treated the

patient, increased his Celexa dosage, and prescribed Risperdal for his " 'delusional thinking and to reduce anxiety.' " (*Id.* at p. 229.) Several times they asked the patient if he intended " ' "to hurt [his] former girlfriend" ' " or "to harm anyone"; the patient stated he did not. (*Id.* at pp. 228–229.) The patient did not communicate any threats of physical violence against the former girlfriend or her family. (*Id.* at p. 227.) Nonetheless, the patient shot "and killed three members of [her] family and injured more relatives" before committing suicide. (*Id.* at pp. 227, 229.) The former girlfriend and other plaintiffs sued the defendants for wrongful death and personal injuries allegedly caused by the defendants' professional malpractice. (*Id.* at pp. 227–228.)

The trial court granted summary judgment in favor of the defendant psychotherapists, and the Court of Appeal affirmed. (*Calderon, supra,* 131 Cal.App.4th at pp. 227–228.) The appellate court held the trial court correctly determined the defendants owed no duty of care to the plaintiffs and therefore the plaintiffs could not establish a threshold element of their professional malpractice causes of action. (*Id.* at pp. 232–233.)

In reaching this conclusion, *Calderon* first noted that whether a duty of care to the plaintiffs exists in any particular negligence case " 'is a question of law to be resolved by the court.' " (*Calderon, supra,* 131 Cal.App.4th at p. 233.) "Where, as here, there is no privity of contract between the parties, our Supreme Court has 'employed a checklist of factors to consider in assessing legal duty . . . .' " (*Ibid.*) This determination " ' "is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm." ' " (*Ibid.*) These factors were first enunciated by our Supreme Court in *Biakanja v. Irving* (1958) 49 Cal.2d 647, 650 [320 P.2d 16] (*Biakanja*).)

Applying the *Biakanja* factors, *Calderon* stated: "The transaction between [the defendants] and [the patient] was not intended to affect or benefit [the plaintiffs] in any way. The transaction was intended to benefit [the patient] by providing him with therapy for his mental problems. It was not reasonably foreseeable that [the patient] would harm members of [his former girlfriend's] family. . . . [The defendants] had no information indicating that [the patient] had been violent in the past. Lacking clairvoyant powers, they could not predict future dangerousness. [The patient] always insisted that he did not

intend to harm [his former girlfriend] or anyone else. [The patient's] family never indicated to [the defendants] that he might harm another person. [¶] [The plaintiffs] unquestionably suffered injury, but the connection between [the defendants'] conduct and the injury is not sufficiently close to impose on [the defendants] a duty of care to [the plaintiffs]. [The patient] inflicted the injuries because of his mental illness and, in particular, his delusional belief that [his former girlfriend] had deliberately infected him with [a blood virus]. [The defendants] were in no way responsible for [the patient's] mental illness or delusional belief, which existed before he entered therapy. [¶] There is no moral blame attached to [the defendants'] conduct even if they were negligent. The evidence shows that they acted in good faith in treating [the patient]. [¶] Finally, we believe that imposing on [the defendants] a duty of care to [the plaintiffs] would not prevent harm in future cases by encouraging greater care by psychotherapists. The duty of care that psychotherapists owe to their patients is sufficient to deter them from committing acts of professional malpractice." (*Calderon, supra*, 131 Cal.App.4th at pp. 233–234.)

The foregoing analysis applies equally here. Factual differences between *Calderon* and the instant case are that (1) the *Calderon* patient believed his former girlfriend had purposely infected him with a blood virus, a delusion known to his psychotherapist, while here, Freund had no known motivation to hurt the Smith family, and (2) the *Calderon* defendants had no knowledge of any past violence by their patient, while here, plaintiffs claim petitioner may have known of Freund's rages against his parents in 2001. These factual distinctions do not support the existence of a duty here. The *Calderon* murders were at least as foreseeable as Freund's shootings, since the *Calderon* patient's anger was targeted at his former girlfriend, whereas Freund's prior violence was directed against his parents and not the Smiths.[6]

Plaintiffs try to distinguish *Calderon, supra*, 131 Cal.App.4th 224 in another way. They assert *Calderon* involved "a patient who was already deranged, rather than being made homicidal by his psychotherapist." They argue there "was no allegation in *Calderon* that the psychiatrist was a *cause*

---

[6] On appeal plaintiffs claim "the extent to which [petitioner] knew of [Freund's violence toward his parents in 2001] is unknown because [petitioner] has refused to appear for deposition." Petitioner did agree to an April 2008 deposition, but Freund's parents "objected to the deposition and production of records." When petitioner moved for summary judgment, he declared he had no knowledge of Freund's violent history.

Petitioner's potential knowledge of Freund's 2001 rages does not affect our conclusion petitioner owed no duty of care to plaintiffs. Thus, there is no merit in plaintiffs' argument under Code of Civil Procedure section 437c, subdivision (h) that "facts essential to justify opposition [to summary judgment] may exist but cannot . . . be presented . . ." because of petitioner's refusal to testify at a deposition.

of the patient's obsession with blaming the girlfriend." They suggest that here, in contrast, petitioner caused Freund to turn murderous. First, this argument ignores Freund's preexisting mental disorder which necessitated his psychotherapeutic treatment. As early as 2001, Freund had exhibited violent tendencies toward his parents. And when he later became petitioner's patient, he already suffered from Asperger's syndrome and the consequent frustration about his extreme social problems. Petitioner did not create Freund's painful mental disorder and his traumatizing social isolation. Moreover, *Calderon* cannot be distinguished so easily on this basis. While the *Calderon* opinion does not recite the allegations of the complaint, the plaintiffs necessarily must have alleged in their medical malpractice claim that the defendants caused or contributed to the homicides and other assaults committed by their patient.

Second, and more fundamentally, plaintiffs' argument that petitioner's treatment of Freund was the actual cause of Freund's attack on the Smith family skips over the issue of duty, i.e., whether petitioner owed *plaintiffs* a duty of care when making medical decisions regarding the treatment of his *patient*. "In order to establish liability on a negligence theory, a plaintiff must prove duty, breach, causation and damages." (*Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200, 1205 [114 Cal.Rptr.2d 470, 36 P.3d 11].) "The *threshold element* of a cause of action for negligence is the existence of a duty to use due care toward an interest of another that enjoys legal protection against unintentional invasion." (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 397 [11 Cal.Rptr.2d 51, 834 P.2d 745], italics added.) " 'Courts . . . have invoked the concept of duty to limit generally "the otherwise potentially infinite liability which would follow from every negligent act . . . ." ' " (*Ibid.*) In California, we assess the presence or absence of a defendant's legal duty to a plaintiff not in privity with defendant by weighing and balancing the six *Biakanja* factors. (*Ibid.*) Notably absent from these factors is an unadorned "but for" causation analysis.

We note also the *Calderon* patient's known preexisting delusion increased the foreseeability of harm to the victims in that case and yet the Court of Appeal concluded the defendants owed the plaintiffs no duty of care. As discussed above, the *Calderon* patient targeted his anger at his former girlfriend. Thus, the former girlfriend and her family were identifiable potential victims. Here, in contrast, Freund exhibited no violent tendencies or motives against the Smith family. As plaintiffs stress in their argument, Freund was not already noticeably deranged. Essentially, plaintiffs ask us to infer from the fact that Freund's actions were *unforeseeable* that, a fortiori, petitioner may have *caused* Freund's derangement by prescribing him ethical drugs. But as noted above, duty and causation are separate elements of a cause of action for negligence. Plaintiffs' argument elevates the lack of

foreseeability into a factor weighing in favor of finding a duty, a result totally at odds with *Biakanja, supra,* 49 Cal.2d 647, 650.

Thus, like *Calderon,* we conclude petitioner did not owe plaintiffs a duty of care and therefore plaintiffs cannot establish a threshold element of their medical negligence claim. Because their medical negligence cause of action fails, so too does Brandon's emotional distress claim against petitioner, since petitioner is not liable for the murders that allegedly caused Brandon emotional distress. Petitioner is entitled to summary judgment.[7]

Plaintiffs rely on three cases, but they are inapposite. The first two cases—*Myers v. Quesenberry* (1983) 144 Cal.App.3d 888 [193 Cal.Rptr. 733] (*Myers*) and *Reisner v. Regents of University of California* (1995) 31 Cal.App.4th 1195 [37 Cal.Rptr.2d 518] (*Reisner*)—are failure to warn cases involving nonpsychotherapists. The third case—*Bragg v. Valdez* (2003) 111 Cal.App.4th 421 [3 Cal.Rptr.3d 804] (*Bragg*)—involved the release for lack of insurance of a patient being held under the Lanterman-Petris-Short Act (LPS Act), Welfare and Institutions Code section 5000 et seq., despite the psychiatrist's determination that the patient was still a danger to himself and others.

In *Myers, supra,* 144 Cal.App.3d 888, the defendant physicians treated a patient "for diabetes and pregnancy." (*Id.* at p. 890.) While the patient was suffering from unstabilized diabetes, the defendants advised her that her fetus was dead and had to be "removed within 18 hours." (*Ibid.*) The patient became "emotionally upset," but the doctors directed her "to drive immediately to [a hospital] for preliminary laboratory tests." (*Ibid.*) The patient "lost control of her car due to a diabetic attack and struck [the plaintiff] as he was standing by the side of the road." (*Id.* at pp. 890–891.) The plaintiff sued the defendants "for negligently failing to prevent [the patient] from driving." (*Id.* at p. 890.) The trial court sustained the defendants' demurrer to the plaintiff's complaint. The Court of Appeal reversed, holding that the plaintiffs' complaint stated "an action against the doctors for negligently failing to warn [the patient] against driving in an uncontrolled diabetic condition complicated by a missed abortion." (*Ibid.*)

*Reisner, supra,* 31 Cal.App.4th 1195, involved a surgeon who learned his 12-year-old patient had received a transfusion of blood contaminated with human immunodeficiency virus (HIV), but failed to inform the patient. (*Id.* at

---

[7] Because petitioner owed no duty of care to plaintiffs, we "need not consider whether section 43.92 shields [petitioner] from liability for [his] alleged professional malpractice." (*Calderon, supra,* 131 Cal.App.4th at p. 233.)

pp. 1197–1198.) About five years later, the patient was diagnosed with AIDS and her boyfriend tested positive for HIV. (*Id.* at p. 1198.) The boyfriend sued the surgeon and a hospital for negligence. (*Id.* at p. 1197.) The defendants conceded they had a duty to control the patient's conduct or to warn the patient "of the risks involved in certain conduct" so as to avoid foreseeable harm to a third person. (*Id.* at pp. 1198–1199.) Their sole defense was that they owed no duty to a third person who was "both unknown and unidentifiable." (*Id.* at p. 1199.) The trial court granted, without leave to amend, the defendants' motion for judgment on the pleadings. (*Id.* at p. 1197.) The appellate court reversed, holding that the defendants owed a duty to the boyfriend, even though they did not know the boyfriend's identity or that he even existed. (*Id.* at pp. 1197, 1199.) The Court of Appeal clarified that "the duty involved in this case—a duty to warn a contagious patient to take steps to protect others—has nothing to do with a physician's decision about how to treat his patient . . . ." (*Id.* at p. 1203.)

Neither *Myers* nor *Reisner* involved allegations the doctors were negligent in their medical treatment of patients. Rather, the alleged wrong was the physicians' failure to warn their patients—in *Myers*, of the danger of driving a vehicle while emotionally distraught and suffering from uncontrolled diabetes, and in *Reisner*, of the patient's exposure to HIV and her need to take precautions to prevent spreading the disease. Section 43.92 did not apply in *Myers* and *Reisner* because the defendants were not psychotherapists. (*Myers*, in fact, preceded the enactment of § 43.92.)

Finally, in *Bragg, supra*, 111 Cal.App.4th 421, a patient "was involuntarily admitted for a 72-hour detention" under the LPS Act because he was a danger to himself and others. (111 Cal.App.4th at pp. 425–426.) After 72 hours, his treating psychiatrists determined he "was still a danger to himself and others," but released him from involuntary commitment because he lacked insurance. (*Id.* at pp. 427–428.) Nineteen days later, the patient attacked, kidnapped, stabbed and killed the "plaintiffs' decedent, a 66-year-old woman." (*Id.* at p. 427.) The decedent's heirs sued the psychiatrists for her wrongful death. (*Id.* at p. 425.) The trial court sustained without leave to amend the defendants' demurrer to the complaint. (*Id.* at p. 428.) The Court of Appeal reversed. (*Id.* at p. 435.)

In analyzing whether the defendants owed a duty to third parties injured by the improperly released patient, the appellate court applied the factors enunciated by our Supreme Court in *Rowland v. Christian* (1968) 69 Cal.2d

108, 113 [70 Cal.Rptr. 97, 443 P.2d 561]:[8] "Here, assuming the allegations are true, [the patient], who had been restrained with 'bilateral ankle and wrist restraints' after striking a security guard, was enough of a danger to others that defendants had requested an additional 14 days' commitment so that [the patient] could receive the intensive psychotherapy they felt was necessary. Nevertheless, without receiving any therapy, and without any notification to any other mental health care provider or the police, [the patient] was turned loose into an unsuspecting community. The ostensible reason: [the patient] had no insurance. It is foreseeable that someone who is dangerous to others is liable to act out and be dangerous. That [the patient] did act out and kill plaintiff[s'] mother is not disputed. It is alleged that [the patient's] killing of plaintiffs' mother was due to defendant's release of [the patient] because of monetary reasons, not because [the patient] was no longer a danger to others. Preventing future incidents is also furthered by imposing a duty to the injured party. . . . Finally, there can be no moral justification for ejecting upon society, without notice, a person who is dangerous to others merely because he is uninsured." (*Bragg, supra,* 111 Cal.App.4th at pp. 431–432, fns. omitted.) *Bragg* further held "the immunities for treating psychiatrists contained within the LPS Act are not applicable unless the treating psychiatrist complies with the requirements of the LPS Act prior to releasing someone who is a danger to himself or others." (*Id.* at p. 425.) Section 43.92 was inapplicable to the case because the complaint alleged a "failure to do one's duty under the involuntary commitment procedures of the LPS Act." (*Bragg,* at pp. 434–435.) The *Bragg* psychiatrists were not alleged to have been merely negligent in the medical treatment of their patient. Indeed, they had correctly determined their patient was a danger to himself and others but nevertheless released him into an unsuspecting community. The *Bragg* defendants failed to "protect public safety," one of the legislative purposes of the LPS Act. (Welf. & Inst. Code, § 5001, subd. (c).)

Here, Freund had not been involuntarily committed under the LPS Act nor had he been diagnosed as a danger to himself and others. There is no allegation or evidence petitioner acted in bad faith, or for reasons unrelated to necessary medical treatment. In sum, *Bragg* is no precedent for the imposition of a duty of care here upon petitioner.

---

[8] These factors are generally the same as those applied in *Biakanja* and *Calderon,* except that the *Rowland* factors include "the availability, cost, and prevalence of insurance for the risk involved." (*Bragg, supra,* 111 Cal.App.4th at p. 431.) *Rowland* has been partially superseded by statute on a different issue. (See *Calvillo-Silva v. Home Grocery* (1998) 19 Cal.4th 714 [80 Cal.Rptr.2d 506, 968 P.2d 65].)

## DISPOSITION

The petition is granted. Let a peremptory writ of mandate issue directing the superior court to vacate its order denying petitioner's summary judgment and to issue a new order granting petitioner summary judgment. Petitioner is awarded his costs.

Sills, P. J., and Fybel, J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied June 24, 2009, S173040.