[No. G043486. Fourth Dist., Div. Three. Feb. 2, 2011.]

DENISE SMITH et al., Plaintiffs and Appellants, v.
KAREN FREUND et al., Defendants and Respondents.

**COUNSEL**

Law Offices of Barry Novack, Barry B. Novack and Jonathan Parrott for Plaintiffs and Appellants.

Inglis, Ledbetter & Gower, Richard S. Gower and Gregory J. Bramlage for Defendants and Respondents.

**OPINION**

**IKOLA, J.**—In this tragic case, 19-year-old William Freund, who suffered from Asperger's syndrome and lived as a dependent with his parents (defendants Karen and Dennis Freund), shot and killed two people before going home and committing suicide. The victims were members of the immediate family of plaintiffs Denise Smith and her son, Brandon Smith.[1]

Plaintiffs sued defendants for wrongful death, alleging defendants negligently supervised their son. Brandon also sued defendants for negligent infliction of emotional distress. Defendants moved for summary judgment, contending "that as a matter of law they had no duty to control/supervise their adult son and could not warn [plaintiffs] of a potential threat they had no knowledge of." Plaintiffs opposed the summary judgment motion and moved for a continuance so they could depose William's doctors. The court denied plaintiffs' continuance motion and granted defendants' summary judgment motion. On appeal, we reversed the judgment, holding the court abused its discretion by denying plaintiffs a continuance to complete their discovery. We explained we could not "say that, regardless of *anything* plaintiffs could have learned by deposing William's doctors, defendants would still have no duty to supervise William."

After the case was remanded to the trial court, plaintiffs deposed William's doctors and submitted to the court a separate statement of further undisputed material facts. The court again granted defendants' summary judgment motion, concluding they owed no duty of care to third parties to control their adult son's actions. We affirm the judgment because William's shooting of third parties was unforeseeable.

## FACTS

Plaintiffs' counsel deposed Dr. Michael Elliott, William's psychologist, and Dr. Laurence Greenberg, William's psychiatrist. Plaintiffs then filed a separate statement of "further" undisputed material facts, the most recent separate statement of undisputed facts in the record. (*Oldcastle Precast, Inc. v. Lumbermens Mutual Casualty Co.* (2009) 170 Cal.App.4th 554, 574–577 [88 Cal.Rptr.3d 363] [relevant *facts* are limited to those set forth in separate statements of undisputed facts; however, court has discretion to consider *evidence* not included in separate statements].) That statement of undisputed

---

[1] For convenience we refer to the Smiths and the Freunds individually by their first names. We mean no disrespect.

The facts and court proceedings in this case through June 18, 2008, are discussed in detail in an unpublished opinion of this court, of which we take judicial notice. (*Smith v. Freund* (June 8, 2009, G040976).)

facts included the following disputed and undisputed facts: Defendants were the adoptive parents of their only son, William, who shot and killed two immediate family members of plaintiffs in October 2005. At the time of the shootings, William was a high school graduate, attended ITT College, and was 19 years old. Despite William's age, plaintiffs challenged defendants' characterization of him as an adult because he "was an autistic teenager who lived at home with his parents and was supported by them."

Several years earlier, in 2001, a pediatric neurologist confirmed "William had 'rages,' and 'physically attack[ed] his parents,' " and suggested he might have to be placed outside the family home. Soon after William started high school, he complained of problems concentrating and understanding other students' conversations, so defendants took him to see Drs. Elliott and Greenberg; both doctors told defendants William suffered from Asperger's syndrome. "Dr. Greenberg's ultimate diagnosis of William was major depressive disorder with psychotic features, Asperger's [syndrome]," and attention deficit disorder. Dr. Greenberg prescribed medications for William that could cause "changes" in him. According to plaintiffs, defendants knew the medicines could cause "thoughts of hurting oneself or others." Drs. Elliott and Greenberg told defendants they needed to closely monitor and supervise William.

In November 2002, William stopped seeing Dr. Elliott. But in August 2005, two months before the shootings, he returned for therapy due to a "relapse of his agitation and irritability." Shortly before the shootings, defendants told Dr. Elliott that William exhibited "irritability and nastiness." Less than a month before defendants made this statement, William had started taking a new antidepressant medicine. Dr. Greenberg, who prescribed William's medicines, asked defendants to phone him after William had been taking a new medication for four days. Dr. Greenberg instructed defendants to contact him if "changes" in William became apparent; he told them "to exercise 'extreme vigilance for emergence of acute psychiatric symptoms,' meaning he 'wanted them to keep an eye out for anything sudden.' " A month before the shootings, defendants told Dr. Greenberg that William was "in and out of reality," and exhibited "irritability and nastiness." In the week before the shootings, defendants told Brandon that William was "acting weird."

Also in the month before the shootings, William bought a gun and posted messages on the Internet indicating he was going to commit suicide, he might "take others with him," and he had attempted suicide more than once before. William "blamed his mental condition on the medications he was taking." Defendants did not know William had made any threats of violence or suicide on the Internet or that he possessed a firearm. Defendants knew of no hostility on William's part, or any threats made by him, against any member of plaintiffs' family.

But plaintiffs alleged defendants "had actual knowledge that William had acted violently in the past," because William had physically attacked defendants, punched his father in the eye because his father interfered with a video game, and slapped another student at school. Defendants knew William had had "suicidal ideation."

Evidence referenced in the separate statement included portions of defendants' declarations and depositions, as well as the depositions of Dr. Elliott, Dr. Greenberg, and the pediatric neurologist.

## DISCUSSION

In defendants' summary judgment motion, they claimed the undisputed fact that William was 19 at the time of the shootings negated "as a matter of law all of the elements of the negligence causes of action *and* was a complete defense to" those causes of action. They asserted the fact that William was living in defendants' home did not change this conclusion. They further argued that because the attacks were unforeseeable, plaintiffs could not establish the negligence element of duty of care.

On appeal, plaintiffs contend defendants had a duty to monitor and control William's actions, and to prevent him from harming others, on two alternative bases: (1) because defendants had a special relationship with their son, or (2) because defendants voluntarily undertook a duty to monitor him. Plaintiffs argue defendants had the ability to control William because he lived with them and was dependent upon them. They further assert that, "even if the Court uses a general foreseeability standard for determining duty, it is clear that a violent outburst by William was foreseeable to" defendants.

Before addressing plaintiffs' contentions, we briefly review the law on summary judgment and third party negligence claims. "A 'motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' [Citation.] 'A defendant moving for summary judgment "bears the burden of persuasion that 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' thereto." ' [Citation.] An appellate court reviews 'the trial court's decision de novo, considering all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports.' [Citation.] The moving party's evidence is strictly construed, while that of the opponent is liberally construed, and 'any doubts as to the propriety of granting the motion' are resolved in the opponent's favor." (*Greenberg v. Superior Court* (2009) 172 Cal.App.4th 1339, 1346 [92 Cal.Rptr.3d 96] (*Greenberg*).)

■ Plaintiffs' wrongful death claim and Brandon's emotional distress cause of action alleged defendants were negligent. "In order to establish liability on a negligence theory, a plaintiff must prove duty, breach, causation and damages." (*Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200, 1205 [114 Cal.Rptr.2d 470, 36 P.3d 11].) The duty element is the defendant's legal duty to protect the plaintiff from harm. (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 397 [11 Cal.Rptr.2d 51, 834 P.2d 745].) Whether a duty to the plaintiff exists in any particular negligence case is a question of law. (*Kentucky Fried Chicken of Cal., Inc. v. Superior Court* (1997) 14 Cal.4th 814, 819 [59 Cal.Rptr.2d 756, 927 P.2d 1260].) Courts use the concept of duty to restrict the otherwise potentially unlimited liability flowing from a negligent act. (*Bily,* at p. 397.) A determination that a duty exists amounts to a policy decision that a particular plaintiff should be protected (*Dillon v. Legg* (1968) 68 Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912]), i.e., "that, in cases of a particular type, liability should be imposed for damage done" (*Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 434 [131 Cal.Rptr. 14, 551 P.2d 334] (*Tarasoff*)).

■ In a parental liability action based on parental negligence, analysis of the duty element depends on whether the plaintiff has alleged "misfeasance" or "nonfeasance" by the parents. (Andrews, *The Justice of Parental Accountability: Hypothetical Disinterested Citizens and Real Victims' Voices in the Debate over Expanded Parental Liability* (2002) 75 Temp. L.Rev. 375, 389 (hereafter *Justice of Parental Accountability*).) "Under prevailing common law, a potential defendant's general duty of due care extends only to the foreseeable victims of the defendant's affirmative, risk-creating conduct ('misfeasance'). Most cases involving alleged parental negligence may be characterized as situations in which the parents have 'failed to act,' or failed to control their child for the protection of another ('nonfeasance'). The common law traditionally holds that one has no duty to take affirmative actions for the protection of another, absent special duty-creating circumstances." (*Ibid.,* fns. omitted.)

■ Here, plaintiffs accuse defendants predominantly of nonfeasance, alleging defendants failed to monitor and control their son.[2] In a negligence case where the plaintiff alleges a defendant had a duty to control another person's conduct, "special rules come into play." (*Megeff v. Doland* (1981) 123 Cal.App.3d 251, 256–257 [176 Cal.Rptr. 467] (*Megeff*).) "In general, one owes no duty to control the conduct of another person [citations], but the courts have created limited exceptions based on various special relationships

---

[2] Plaintiffs obliquely allege that defendants breached "their duty of care so as not to create a risk of harm to third persons," arguably a misfeasance claim. They never specify or argue, however, in what way defendants created a risk, e.g., they do not allege defendants caused the harm by taking William for psychological therapy and psychiatric care.

between a defendant and . . . the person whose conduct needs to be controlled . . . ." (*Id.* at p. 257.) The relationship between parent and child is one such special relationship.[3] (*Wise v. Superior Court* (1990) 222 Cal.App.3d 1008, 1013 [272 Cal.Rptr. 222].) Another special relationship ensues when a party " 'takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled . . . .' "[4] (*Megeff*, at p. 257; see *Hansra v. Superior Court* (1992) 7 Cal.App.4th 630, 645 [9 Cal.Rptr.2d 216] (*Hansra*).)

A basic requisite of a duty based on a special relationship is the defendant's ability to control the other person's conduct. (*Megeff, supra,* 123 Cal.App.3d at p. 261.) If the relationship "creates no inference of an ability to control, the actual custodial ability must affirmatively appear." (*Ibid.,* fn. omitted.)

In addition, in special relationship cases, the foreseeability of the harm is critical to the existence of a duty. (*Megeff, supra,* 123 Cal.App.3d at p. 261.) When deciding whether a duty of care arose from a special relationship, a court should consider "pertinent factors," including " 'foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' " (*Davidson v. City of Westminster* (1982) 32 Cal.3d 197, 203 [185 Cal.Rptr. 252, 649 P.2d 894].) These factors—drawn from *Rowland v. Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561] (*Rowland*)[5] and previously articulated in *Biakanja v. Irving* (1958) 49 Cal.2d 647, 650 [320 P.2d 16] (*Biakanja*)—apply to negligence

---

[3] Plaintiffs argue defendants had a special relationship with William, even though he was an adult, because he "was autistic and lived with his parents in the same way as a minor child," and that defendants had the ability to control him because he lived with them in their home, they "supported him," and they had the ability to monitor him.

[4] Plaintiffs contend defendants voluntarily undertook to monitor William and his medications at least in part for the protection of third parties, relying on section 324A of the Restatement Second of Torts, which states: "One who undertakes . . . to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if [¶] . . . his failure to exercise reasonable care increases the risk of such harm . . . ." Central to liability under this section is the requirement that a defendant should have recognized that his or her services were "necessary for the protection of a third person or his things," i.e., that the harm to the third person or his things was foreseeable. (*Ibid.*)

[5] *Rowland, supra,* 69 Cal.2d 108 was partially superseded by statute on a different issue as stated in *Calvillo-Silva v. Home Grocery* (1998) 19 Cal.4th 714, 722 [80 Cal.Rptr.2d 506,

cases where there is no privity of contract between the plaintiff and the defendant. (*Greenberg, supra*, 172 Cal.App.4th at p. 1349.) A court must weigh and balance these *Biakanja/Rowland* factors (*ibid.*), recognizing that the most important among them is the foreseeability of the harm to the plaintiff (*Megeff*, 123 Cal.App.3d at p. 256; see also *Justice of Parental Accountability, supra*, 75 Temp. L.Rev. at p. 390, fns. omitted [under *Tarasoff, supra*, 17 Cal.3d at p. 435, a court could "find that the parent-child relationship supports a duty to control the child or otherwise to act for the benefit of a third party"; however, "*Tarasoff* arguably turned on the presence of a readily identifiable third party potential victim."]).[6]

Thus, a plaintiff who alleges a defendant had a duty to control another person based on a special relationship must make a twofold showing (1) that the defendant had the ability to control the actor *and* (2) that the defendant bore a duty of care under a *Biakanja/Rowland* analysis.[7] In this case we need only address the second prong of the analysis to conclude defendants owed no duty of care to third parties to control William and prevent him from harming other people. The only inference the evidence reasonably supports is that defendants could not foresee William's violent acts because they knew of no propensity or intention of William to harm third parties (as opposed to himself or his parents). In Dr. Elliott's deposition, he testified Asperger's syndrome is a "social deficit" and "nonverbal learning" disorder and there is no substantial correlation between Asperger's syndrome and physical hostility toward others. In Dr. Greenberg's deposition, he clarified that when he diagnosed William with major depressive disorder with psychotic features, he used the term "psychotic features" "loosely as a way of trying to capture some of the neuroses that [William] had from the Asperger's"; Dr. Greenberg did *not* "observe frank psychotic features as in delusions [or] hallucinations." Although defendants knew the medications prescribed by Dr. Greenberg could cause "changes" in William, they understood this to signify a very slight chance that William might become suicidal. Although Dr. Greenberg told defendants certain medicines could cause "suicidal thinking in some patients," he never advised them the medications could "generate homicidal

---

968 P.2d 65], disapproved on a different issue in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853 [107 Cal.Rptr.2d 841, 24 P.3d 493].

[6] Courts have applied the *Biakanja/Rowland* duty analysis in determining parental liability for adult children and have additionally emphasized the parents' ability to control the child. (*Hansra, supra*, 7 Cal.App.4th at pp. 639–640, 645 [plaintiffs did not allege mother "had an *ability to control*" adult married son who did not live with her]; *Todd v. Dow* (1993) 19 Cal.App.4th 253, 256, 258–259 [23 Cal.Rptr.2d 490] [parents had no ability to control adult married son who did not live with them].)

[7] In effect, "the general negligence claim and the supposedly independent special relationship claim are . . . indistinguishable." (*Hansra, supra*, 7 Cal.App.4th at p. 645.) A court will necessarily take note of any special relationship when analyzing the defendant's conduct and knowledge (*id.* at p. 646), e.g., the *Biakanja/Rowland* factor of the closeness of the connection between the defendant's conduct and the injury suffered.

propensities." In his deposition, Dr. Greenberg testified that when defendants reported William was "in and out of reality" after taking a particular medicine (Geodon), in context this statement implied William "was spending more time on his computer and not engaged with the outside world." Dr. Greenberg told William to discontinue taking Geodon; defendants and William told Dr. Elliott he had stopped taking the drug.

Although there was evidence of William's aggressive conduct toward his parents, the record reveals only one instance in which William acted in anger toward another third party. According to Dr. Elliott's deposition, William told the psychologist that in 2001 or 2002, he (William) slapped another student at school in the face because the other student "karate-chopped him" on the shoulder and William felt he had a right to defend himself. Based on this lone instance of William's behavior against a student who had struck William first, defendants could not reasonably foresee that William would, several years later, harm a third party.

Plaintiffs point to William's starting a new antidepressant medicine, his irritability and nastiness, and his weird behavior, shortly before the shootings. Again, although this may have created a foreseeable risk that William might physically attack his parents (on whom he blamed his problems) or hurt himself, the behavior provided no forewarning that William might shoot and kill the father and sister of his only friend, or any other third party. Even Drs. Elliott and Greenberg reacted to news of the murders with shock and dismay, wondering, "Where were the clues? Where were the warnings?" and agreeing it was an "unbelievable thing."

As for the other *Biakanja/Rowland* factors, defendants' actions in seeking medical help for their son and in keeping him in their home were not meant to affect plaintiffs, but rather to help William deal with his painful mental problems. Defendants cannot be morally blamed for trying to help their son, rather than abandon him. Dr. Elliott testified William threatened to move out of defendants' home, but Dr. Elliott "explained to him that moving out was unrealistic" because William did not have a job, money, or anywhere to go. Any connection between defendants' conduct and the shootings is speculative. Defendants' conduct amounted to this: they allowed William to live in their home, attended therapy sessions with him, monitored his medicine compliance, and reported to the doctors as requested. To impose a duty of care on defendants could cause greater harm in future cases by encouraging parents to disassociate from their adult children with chronic serious problems. Plaintiffs do not assert that parental liability insurance is prevalent. As to the final remaining factor, plaintiffs suffered a deep and tragic injury. But the other *Biakanja/Rowland* factors weigh in favor of finding no duty on the part of defendants here.

Because there is no triable issue of material fact concerning a duty of defendants to control William's actions, the court properly granted their summary judgment motion.

## DISPOSITION

The judgment is affirmed. Defendants shall recover their costs on appeal.

O'Leary, Acting P. J., and Fybel, J., concurred.

Appellants' petition for review by the Supreme Court was denied May 11, 2011, S191439.