Filed 3/16/20

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| K.G., a Minor, etc.,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>S.B.,<br><br>    Defendant and Respondent. | D075872<br><br>(Super. Ct. No. 37-2018-00029143-CU-PO-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge. Affirmed.


Romancore Law, Robert Radulescu; and Robert A. Waller, Jr., for Plaintiff and Appellant.

Law Office of Martin N. Buchanan and Martin N. Buchanan for Defendant and Respondent.

# I

# INTRODUCTION

The question posed in this appeal is whether a father who provides financial support for his adult son may be held liable for the death of his son's girlfriend by overdose on methamphetamine allegedly purchased or supplied by the adult son. Plaintiff appeals a judgment of dismissal in favor of S.B. (Father) after the court sustained without leave to amend his demurrer to plaintiff's complaint for wrongful death based on negligence. The trial court concluded no special relationship existed between Father and his adult son such that Father should be held liable for wrongful death of the girlfriend. We agree and affirm the judgment.

# II

# BACKGROUND

## A[1]

Father knew his son, C.B., had been addicted to drugs for a number of years, and "had paid on numerous prior occasions" for C.B. to undergo "detox and/or drug rehabilitation and treatment programs to treat his addiction." C.B. was not employed and was "dependent" on Father for financial support. Father provided "regular, consistent, and frequent financial support" to C.B., which included paying for C.B.'s housing and living expenses as well as giving him money for spending and "necessities of life."

---

[1] "Because this appeal arises from the sustaining of a demurrer, we summarize the facts alleged in the complaint, accepting as true the properly pleaded factual allegations." (*Berman v. HSBC Bank USA, N.A.* (2017) 11 Cal.App.5th 465, 468 (*Berman*).)

Father knew C.B. was in a lengthy relationship with A.C. "which involved a significant amount of drug use between them." Father knew or should have known C.B. used money Father provided to purchase drugs and share them with A.C.

A.C. checked herself out and left a detoxification facility with C.B. the weekend before her death. On several occasions, A.C.'s parents spoke to Father about the drug-related dependency between C.B. and A.C. They told Father that if he did not stop providing C.B. with the financial resources to buy drugs, someone was going to end up dead. Father did not cut off C.B. financially and continued to support him.

Father drove A.C. home from C.B.'s apartment and knew or should have known C.B. supplied A.C. drugs when they were together.

The following day, C.B. picked up A.C. from her parents' home after a confrontation with her parents. C.B. later battered, punched, kicked, or otherwise hit A.C. leaving physical marks. When C.B. was detained on charges of domestic violence against A.C., Father posted bail for C.B.

Two days before her death, C.B. and a friend drove A.C. to an emergency room due to illness. C.B. allegedly supplied A.C. drugs in the emergency room parking lot. A.C. checked herself out of the emergency room after being diagnosed with sepsis.

On the day of A.C.'s death, C.B. drove A.C. to a bank to obtain money from an account provided by Father. When C.B.'s bank card was declined, they waited in the car in the parking lot for the bank to open. They used drugs which C.B. allegedly purchased with money he received from Father. A.C. died as a result of methamphetamine intoxication.

3

B

Plaintiff, A.C.'s minor son, sued C.B. and Father for the wrongful death of A.C. The complaint asserted a cause of action against both defendants for negligence, a cause of action against Father for negligent entrustment of his vehicle to C.B., and a cause of action against C.B. pursuant to Health and Safety Code section 11700 et seq.

Father filed a demurrer to the complaint contending the complaint failed to state a cause of action against him for negligence because he owed no legal duty to A.C. with respect to her drug use. He also contended plaintiff could not state a claim for negligent entrustment because there was no allegation A.C. died as a result of negligent operation of the vehicle. Plaintiff voluntarily dismissed the negligent entrustment cause of action.

Plaintiff opposed the demurrer contending Father owed a duty to A.C. because C.B. was dependent upon Father, even though C.B. was an adult, and Father failed to take reasonable steps to prevent foreseeable harm. Plaintiff contended Father should have terminated financial support to C.B. or revoked C.B.'s use of Father's car to stop C.B. from supplying A.C. with drugs. Alternatively, plaintiff requested leave to amend to allege additional facts from Father's deposition testimony.

The trial court sustained Father's demurrer without leave to amend. The court stated it was "unwilling to expand the definition of a special relationship between [Father] and his adult son … under the facts alleged. Although plaintiff has alleged [C.B.] was financially dependent on his father, that is not the same as being a dependent."

4

III

DISCUSSION

A

Plaintiff contends the court erred in sustaining Father's demurrer because C.B. was financially dependent upon Father. We disagree.

"A demurrer tests the legal sufficiency of the complaint. (*Berman, supra,* 11 Cal.App.5th at p. 470, citing *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) "A demurrer is properly sustained when the complaint 'does not state facts sufficient to constitute a cause of action,' or where the court 'has no jurisdiction of the subject of the cause of action alleged in the pleading.' (Code Civ. Proc., § 430.10, subds. (e), (a).) 'On appeal from a dismissal following the sustaining of a demurrer, this court reviews the complaint de novo to determine whether it alleges facts stating a cause of action under any legal theory….' " (*Debrunner v. Deutsche Bank National Trust Co.* (2012) 204 Cal.App.4th 433, 438.)

As a general rule " 'one owes no duty to control the conduct of another, nor to warn those endangered by such conduct.' " (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 619 (*Regents*).) "A duty to control, warn, or protect may be based on the defendant's relationship with 'either the person whose conduct needs to be controlled or [with] … the foreseeable victim of that conduct.' [Citations.] Specifically, a duty to control may arise if the defendant has a special relationship with the foreseeably dangerous person that entails an ability to control that person's conduct." (*Ibid.*, citing Rest.3d Torts, Liability for Physical and Emotional Harm, § 41.) One

example of a special relationship giving rise to a duty to control is that of a parent with "dependent children." (Rest.3d Torts, Liability for Physical and Emotional Harm, § 41, subd. (b)(1).)[2]

Comment d to section 41 of the Restatement Third of Torts explains the "basis of the parents' duty with regard to dependent children is the parents' responsibility for child-rearing, their control over their children, and the incapacity of some children to understand, appreciate, or engage in appropriate conduct." (Rest.3d Torts, Liability for Physical and Emotional Harm, § 41, com. d.) The comment recognizes the parental duty of care changes as children reach adolescence and gain independence and concludes, "When children reach majority or are no longer dependent, parents no longer have control, and the duty no longer exists." (*Ibid*.)

The key issue is control. "A basic requisite of a duty based on a special relationship is the defendant's ability to control the other person's conduct. [Citation.] If the relationship 'creates no inference of an ability to control, the actual custodial ability must affirmatively appear.' " (*Smith v. Freund* (2011) 192 Cal.App.4th 466, 473 (*Freund*).) "Thus, a plaintiff who alleges a defendant had a duty to control another person based on a special relationship must make a twofold showing (1) that the defendant had the ability to control the actor *and* (2) that the defendant bore a duty of

---

[2] Restatement Third of Torts, section 41 replaced sections 315, subdivision (a), 316, 317, and 319 of the Second Restatement of Torts and "includes an additional relationship creating an affirmative duty, that of mental-health professional and patient." (*Id.*, com. a.)

care under a *Biakanja/Rowland* analysis."[3] (*Freund*, at p. 474.) Plaintiff here has not and cannot show either.

"[I]n order for one to 'take charge' of a person such that a legal duty to control his or her conduct is created, one must possess the *ability* to control. (*Megeff v. Doland*[ (1981)] 123 Cal.App.3d [251, 261].) When such ability does not exist, no duty arises, rendering inactionable a civil claim against a defendant for the failure to control the conduct of another. (*Ibid.* [defendant adult daughter lacking ability to control conduct of abusive father]; see also *Wise v. Superior Court* (1990) 222 Cal.App.3d 1008, 1014 [defendant wife lacked ability to control husband's violent conduct]; *Hansra v. Superior Court* (1992) 7 Cal.App.4th 630, 645 [no facts alleged sufficient to show defendant mother and brother of violent individual had ability to control his behavior].)" (*People v. Heitzman* (1994) 9 Cal.4th 189, 213.) "The absence of an ability to control is fatal to a claim of legal responsibility." (*Todd v. Dow* (1993) 19 Cal.App.4th 253, 259 [parents of adult child not liable for accidental shooting because they had no ability to control the adult child]; see also *Smith v. United States* (11th Cir. 2017) 873 F.3d 1348, 1352 [control giving rise to a duty is the " ' "legal authority" to restrain a person's liberty' "].)

Although Father provided his son an apartment, money in a bank account, and a car to drive, none of the alleged facts demonstrate Father had an ability to control C.B.'s conduct. C.B. did not live with Father. C.B. made his own choices about how to spend

---

3    *Rowland v. Christian* (1968) 69 Cal.2d 108, 113 (*Rowland*); *Biakanja v. Irving* (1958) 49 Cal.2d 647, 650.

7

the money his father provided. As the trial court noted, C.B. continued to use drugs even though Father had provided C.B. with multiple opportunities for drug treatment.

Analysis of the *Rowland* factors also does not support imposition of liability. The Supreme Court has "identified several factors that may, on balance, justify excusing or limiting a defendant's duty of care. These include: 'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' " (*Regents, supra*, 4 Cal.5th at p. 628, quoting *Rowland, supra,* 69 Cal.2d at p. 113.) In considering these factors, courts "determine 'not whether they support an exception to the general duty of reasonable care on the facts of the particular case before [it], but whether carving out an entire category of cases from the general duty rule is justified by clear considerations of policy.' " (*Regents*, at p. 629.) The factors fall into two categories, the first involving "foreseeability and the related concepts of certainty and the connection between plaintiff and defendant" and the second "embrac[ing] the public policy concerns of moral blame, preventing future harm, burden, and insurance availability." (*Ibid*.)

Father provided financial support for his adult son. The essence of plaintiff's claim is that it was foreseeable money Father provided to C.B. could be used to purchase drugs and either A.C. or C.B. would die as a result of their drug use. But the connection

8

between A.C.'s overdose and Father's conduct in trying to help his son financially is tenuous. Even if Father had cut off his son from all financial support, including housing and transportation, it is not evident lack of such resources would have prevented either C.B. or A.C. from acquiring or using drugs.

Public policy does not support imposing liability on a parent for providing financial support for an adult child. In *Freund, supra*, 192 Cal.App.4th at page 469 the appellate court declined to impose liability for the shooting deaths of two people on the parents of an adult child with Asperger's syndrome who lived with them as a dependent. The court determined the shooting of third parties was not foreseeable and the *Rowland* factors weighed against imposing liability. (*Id*. at pp. 469, 475.) "To impose a duty of care on defendants could cause greater harm in future cases by encouraging parents to disassociate from their adult children with chronic serious problems." (*Id.* at p. 475.)

Other states have similarly declined to impose liability on parents of adult children. In *Trammel v. Bradberry* (2002) 256 Ga.App. 412, the court found no duty for parents to supervise mentally ill adult child. "The plaintiffs seek to find control arising from the ownership of the dwelling, furnishing [adult child] a truck, and allowing him to cut wood to sell, because the father at any time could have conditioned the son's staying in the house owned by the father and uncle on the surrender of the guns. However, this is not the control envisioned under the law; otherwise, every parent, owner of realty, or landlord would find themselves in a special relationship of control with an adult living under their roof. Here, the father merely provided [adult child] with a free place to live, which does not create either the right or exercise of physical control over the behavior of

9

a mentally ill person necessary to create the special relationship." (*Id.* at p. 418; see also *Alioto v. Marnell* (Mass. 1988) 520 N.E.2d 1284, 1285–1286 [no liability for parents of 19 year old for drunk-driving death after a party in the parents' home]; *Reinert v. Dolezel* (Mich.Ct.App. 1985) 383 N.W.2d 148, 150–151 [parents of adult intoxicated driver not liable for injury and death of third parties; duty for parents to control child ends when child becomes an adult]; *Villacana v. Campbell* (Tex.App. 1996) 929 S.W.2d 69, 75–76 [no negligence liability for parents for murder by an adult child who lived at home even though parents allegedly provided alcohol and car].)

We conclude there can be no moral blame attached to Father's conduct as a father financially supporting his son. As the trial court observed, "[c]utting off his son financially does not necessarily lead to a policy of preventing future harm. C.B. may have pursued other financial avenues to obtain drugs. The consequences to the community of imposing a duty to exercise care when providing financial support, with resulting liability for a breach, is extensive. It would create an extended duty of care when financial support was given to family members. No public policy would be advanced by extending liability for supporting family members." We agree public policy does not support an extension of liability under the facts of this case.

B

Plaintiff also contends the court abused its discretion in denying leave to amend. Again, we disagree.

"If the court sustained the demurrer without leave to amend, as here, we must decide whether there is a reasonable possibility the plaintiff could cure the defect with an

10

amendment. [Citation.] If we find that an amendment could cure the defect, we conclude that the trial court abused its discretion and we reverse; if not, no abuse of discretion has occurred. [Citation.] The plaintiff has the burden of proving that an amendment would cure the defect." (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.)

Plaintiff asserted he could allege the following additional facts based on Father's deposition:

- Father knew C.B. was addicted to drugs since he was approximately 16 years old and heroin was his drug of choice;

- Father met A.C. in June 2017 and knew she was seeing C.B.;

- Father knew A.C. was addicted to intravenous drugs because Father found an identification card belonging to A.C. for the City of San Diego's clean needle program (a program where addicts can exchange dirty needles for clean needles);

- Father was concerned about C.B. and A.C. using drugs together;

- In early 2018, Father twice found needle caps and syringes in the backseat of his car after C.B. had used it;

- Father " 'chose to believe' " C.B. when C.B. said A.C. used drugs in the car but C.B. did not;

- Father gave C.B. $1,200 to $1,500 per month through direct deposit into C.B.'s bank account in addition to paying for C.B.'s household expenses and necessities of life;

- Father let C.B. " '[do] for himself with the money that [Father] provided' ";

- Father thought it was possible C.B. used the money he provided to buy drugs; he did not otherwise know where C.B. would get money to buy drugs;

- Father knew C.B. and A.C. fought and Father asked C.B. to stop seeing A.C.;

- Father and A.C.'s parents agreed in early 2018 it would be best to try to get C.B. and A.C. off drugs and to keep them apart;

- Father agreed C.B. and A.C. were in a spiral and if they did not stay away from each other one of them was going to die;

11

- The weekend before A.C. died, Father picked up A.C. after a fight with C.B. at C.B.'s apartment and drove her home;

- When C.B. was detained on charges of domestic battery, C.B. was in possession of Father's car;

- Father never restricted C.B.'s use of Father's vehicle after C.B.'s detention and did not see his vehicle again until after A.C.'s death;

- Father never restricted C.B.'s use of his vehicle between the night he brought A.C. home from C.B.'s apartment and the morning A.C. died;

- Father never told C.B. he would cut off C.B. financially or restrict the use of the car if C.B. continued seeing A.C.;

- Father could have taken away C.B.'s privileges to use Father's car;

- Father could have stopped giving C.B. money on a monthly basis;

- C.B. admitted to Father that he and A.C. had used drugs before she died;

- A.C. died in the backseat of Father's Honda Accord vehicle.

Although these facts add more detail to those alleged in the complaint, plaintiff has not met the burden of establishing these facts cure the defect in the pleading. Even assuming the truth of these facts, they do not alter our analysis that Father should not be held liable for the death of A.C. based on his provision of financial support to C.B. These additional facts do not show Father had an ability to control C.B. Indeed, even though Father cautioned his son against spending time with A.C., C.B. continued to do so. They likewise do not alter our view that the *Rowland* factors do not support imposition of liability. Therefore, the trial court did not abuse its discretion in denying leave to amend.

IV

DISPOSITION

The judgment is affirmed.  Respondent is entitled to his costs on appeal.


McCONNELL, P. J.

WE CONCUR:



HALLER, J.



GUERRERO, J.